**GILES INDUSTRIES, INC.**

v.

**The UNITED STATES.**

**Nos. 140–68, 76–69, 337–69.**

United States Court of Claims.

April 17, 1974.

James E. Shafer, Louisville, Ky., attorney of record, for plaintiff. Smith & Smith and Charles F. Wood, Louisville, Ky., of counsel.

William Kalish, Washington, D. C., with whom was Asst. Atty. Gen., Scott P. Crampton, for defendant. Gilbert E. Andrews, Washington, D. C., of counsel.

Before DAVIS, KASHIWA, and BENNETT, Judges.

## OPINION

### PER CURIAM:

These cases come before the court on plaintiff's exceptions to a recommended decision filed February 7, 1973, by Trial Judge Roald A. Hogenson, pursuant to Rule 134(h). The court has considered the cases on the briefs and oral argument of counsel. Since the court agrees with the recommended decision, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in the cases.* Therefore, it is concluded that in computing its taxable income for each of the years 1964–1967, plaintiff is entitled to deductions, as reasonable allowances for salaries and other compensation paid for personal services actually rendered, in the sum of $75,000 per year for its president, R. O. Giles, $37,500 per year for its vice president, Ray Neely, and $25,000 for 1964 and $37,500 for each of the years 1965–1967 for its treasurer, James Giles. Entry of judgment is deferred until the amounts of recovery on plaintiff's petitions and defendant's counterclaims have been determined in further proceedings pursuant to Rule 131, to permit offsetting of the amounts of recovery to arrive at a net judgment in favor of the party entitled to recover the larger sum.

## OPINION OF TRIAL JUDGE

### HOGENSON, Trial Judge:

In these three consolidated cases, plaintiff, a Tennessee corporation organized in 1959, seeks judgment for refund of alleged overpayments of Federal income tax for calendar years 1964 through 1967. Plaintiff timely filed its return for each year, and paid the amount of tax computed thereon.

For 1964 and 1965, plaintiff paid deficiency assessments, which reflected partial disallowances by the Internal Revenue Service of deductions for officers' compensation paid by plaintiff. In timely claims for refund, plaintiff challenged such disallowances, and also alleged other grounds for relief. More than 6 months elapsed without allowance or disallowance of such claims. Plaintiff timely filed its petition herein for such years, Docket No. 140–68, alleging the same grounds for recovery as asserted in its claims.

Plaintiff timely filed claims for refund of amounts of tax paid as reported on its returns for 1966 and 1967. Such claims were not acted upon within 6 months, and plaintiff timely filed its petitions herein, Docket No. 76–69 for 1966 and Docket No. 337–69 for 1967, covering its claims for those years.

In the latter two cases, defendant filed counterclaims for unpaid deficiencies, assessed after commencement of such cases, for the years 1966 and 1967. Such deficiencies were based in part on partial disallowances of deductions for

---

* The concurring opinion of DAVIS, Judge, follows the opinion of the trial judge which has been adopted by the court.

officers' compensation paid by plaintiff for such years.

On the representation of the parties that it appeared reasonably certain that all other issues would be settled, the trial of these cases was limited to the issues of law and fact relating to the right of either party to recover on the question of extent of deductibility of officers' compensation.

On October 22, 1971, after the trial had been held, the parties filed a stipulation that all issues but one had been settled by agreement of the parties; that the only remaining issue concerned officers' compensation paid by plaintiff to certain of its officers. R. O. Giles, Ray Neely and James Giles; and that the amount of refund to which plaintiff might be entitled, or the amount of additional deficiency which it may owe, should be determined under Rule 131(c)(2) on the basis of the disposition of the compensation issue by the court and the agreement on the other issues.

During the years 1964–1967, plaintiff was engaged in manufacturing and sale to independent dealers of mobile homes, and commencing in 1967, also travel trailers.

Out of 1,100 outstanding shares of plaintiff's stock, R. O. Giles owned 960 shares in 1964 and 840 shares in the years 1965–1967. Ray Neely and his wife, Dorothy (daughter of R. O. Giles), owned respectively 40 and 30 shares in 1964, and 70 and 60 shares in 1965–1967. James Giles (son of R. O. Giles) and his wife, Maxine, had the same respective share holdings as did the Neelys.

Plaintiff deducted, for Federal income tax purposes, the following amounts of compensation paid to its president, R. O. Giles, to its vice president, Ray Neely, and to its treasurer, James Giles, as well as the following amounts of compensation paid to its secretary, Earl Helton, and to its non-officer chief of sales, Bernard Rockstadt:

| Individual | 1964 | 1965 | 1966 | 1967 |
|---|---|---|---|---|
| R. O. Giles | $78,265.09 | $112,675.51 | $100,763.32 | $94,992.77 |
| Ray Neely | 38,870.69 | 56,727.83 | 51,692.73 | 48,599.68 |
| James Giles | 37,070.80 | 57,600.02 | 51,726.93 | 49,618.96 |
| Earl Helton | 9,150.00 | 25,220.76 | 14,100.00 | 11,600.00 |
| Bernard Rockstadt | 38,399.90 | 18,162.25 | ------------ | ------------ |

No issue has been raised as to the compensation paid to Helton and Rockstadt. Rockstadt resigned his employment with plaintiff in the middle of 1965.

The Internal Revenue Service, upon audit of plaintiff's tax returns, determined that no more was deductible as reasonable annual compensation for R. O. Giles, Ray Neely, and James Giles than $25,000 each for the years 1964, 1966 and 1967, and $25,220.76 each for 1965. The assessed deficiencies reflected disallowances of deductions of compensation paid to them in excess of such amounts.

Plaintiff began constructing mobile homes in early 1960 on a very small ba-

sis in Tazewell, Tennessee. Its first mobile homes were relatively high-priced, and did not sell well. R. O. Giles then established the policy, which plaintiff has practiced since 1961, to build mainly low cost units, more readily saleable in plaintiff's market area. In 1962, plaintiff moved its operations to a larger plant located in Middlesboro, Kentucky. By 1965, this new plant was expanded so that its floor space increased from 60,000 to 180,000 square feet, almost five times the floor space of the original shop in Tennessee.

During the years in issue, plaintiff manufactured five to six different models of mobile homes, each model having a

variety of floor plans. In late 1967, it began producing travel trailers in five different models. All these units were built on an assembly line where component parts were added as each unit moved from station to station. The completed units were delivered by plaintiff's 40 trucks to 100 to 125 independent dealers located in 20 to 22 surrounding states.

Plaintiff was able to sell its mobile homes at a price substantially less than the price of comparable models of other manufacturers because of (1) its efficient operations, (2) its elimination of some accessories which other manufacturers included in their units, and (3) its cheaper labor costs in the area of its plant operations.

Plaintiff's dollar sales volume increased from $276,828 in 1960 to $6,776,757 in 1964, and decreased somewhat each year thereafter to $5,629,603 in 1967. During this period of declining dollar sales volume, however, plaintiff's pre-tax income increased from $321,104 in 1964 to $937,808 in 1967. Only in 1966, when the entire industry was adversely affected by a tight money market, did plaintiff's pre-tax income decline from the previous year. Also, plaintiff's cost of materials used in the manufacturing process declined each year from $5,303,826 in 1964 to $3,124,273 in 1967, and plaintiff succeeded at producing mobile homes of a larger size at a declining cost per square foot of floor space.

During the years 1964–1967, plaintiff's four officers constituted the entire management staff, and its only other executive employee was Bernard Rockstadt until he resigned in mid-1965. Plaintiff's administrative personnel were otherwise a secretary-receptionist, an inventory clerk, two to three office clerks, and two sales and dispatching clerks. The inventory clerk and the two sales and dispatching clerks assisted the three officers whose compensation is in issue, and the office clerks and secretary-receptionist assisted the corporate secretary.

The rest of plaintiff's employees were workmen in the plant operations and truckdrivers, varying from year-end forces of 119 in 1964, 212 in 1965, 221 in 1966, to 212 in 1967. The truckdrivers constituted about 20 to 30 of these employees. Plaintiff hired its first plant foreman in 1965. A plant inspector was added in 1966. Four additional plant foremen were hired in 1967.

Plaintiff's founder and president, R. O. Giles, is a native Tennessean, born in 1906, whose formal education ended at the sixth grade. Prior to entering the mobile home manufacturing business, he owned and operated a variety of enterprises, including a country store, a tomato canning operation, a farm, a sawmill, home construction, a planning mill, a lumber yard, an automobile distributorship and garage, and a cedar manufacturing shop which produced bedroom suites, wardrobes and chests. It was while he was engaged in the cedar manufacturing business that he expanded the floor capacity of his shop, purchased and installed machinery for production of mobile homes, and organized plaintiff corporation.

During the years in question, R. O. Giles functioned not just as titular chief executive but as the real head of the company. He was the person responsible for the organization, commencement and development of the business to the status of operations attained at the commencement of the years in issue, and remained its active leader throughout the period directly concerned in this case. He determined basic policy, although some decisions were made in consultation with the vice president and the treasurer. He participated in every facet of the business. Most of his time was spent supervising the production employees, all of whom he hired personally. Since they were unskilled workmen, he taught them how to construct the units. He handled the purchasing and supervised the installation of all machinery. Experienced in the lumber and milling industries, he purchased and supervised the cutting of rough lumber

used in plaintiff's operations. He also assisted in designing new mobile home models and in making changes in the floor plans of existing models. His direct participation in sales activities, however, was limited to taking incoming telephone orders when other personnel were not available, and to meeting occasional visitors to the plant, sometimes taking them to plaintiff's local dealer for accomplishment of sales.

Ray Neely, plaintiff's vice president, finished high school, worked on a farm, was employed by Southern Railway, and engaged in the service station and trucking business before he entered plaintiff's employment in 1961. He earned as much as $120 per week in these endeavors. He had had no previous experience in the mobile home business. Giles hired him to assist in purchasing materials, inventory control and supervising production. In time, he assumed primary responsibility for the purchasing and inventory functions, and continued handling them until James Giles was employed in February 1964. After being trained by Neely for several months, James Giles was assigned such matters.

Beginning in 1963, Ray Neely worked extensively in sales, in cooperation with Bernard Rockstadt, and when the latter resigned in mid-1965, Neely became primarily responsible for sales. Sales were conducted generally over the telephone, and dealers called plaintiff to place orders, sometimes for as many as 10 units. Two clerks, employed in 1965, assisted by taking telephone orders, lessening the effect of Rockstadt's departure. Sales activities also consisted of visiting dealers and supplying them with advertising brochures, and attending out-of-state mobile home shows four or five times each year. Sales incentives such as rebates were provided to dealers who attained prescribed sales levels.

Ray Neely, to a lesser extent than R. O. Giles, supervised production workers. With the aid of the latter, Neely designed the new model of mobile home introduced in 1965, planned rearrange-ments of floor spaces on the various models, and also designed the five models of travel trailers in 1967. Neely priced the units sold, using a bill of materials furnished by James Giles, and adding labor, overhead, profit and hidden costs to arrive at profitable wholesale prices. Neely's other responsibilities included preparing advertising brochures, collecting payments from dealers, conducting transactions with banks, and hiring truckdrivers. He was also in charge of dispatching deliveries of units to dealers, selecting highway routes, securing road-use permits, distributing fuel stickers, and directing departure of trucks early in the morning.

James Giles, plaintiff's treasurer, completed high school and thereafter owned and operated a refrigerator sales and service business for 3 or 4 years. He earned about $6,000 to $7,000 a year before his employment by plaintiff in February 1964. He had had no experience in the mobile home business. Giles hired him to work primarily in purchasing and inventory control, and to learn the overall business.

During 1964, Ray Neely assisted James in purchasing for several months until James learned the function sufficiently to take over complete responsibility. Purchasing was conducted primarily over the telephone, although suppliers also visited plaintiff's office. James bought all of the materials, supplies, equipment and appliances for the mobile homes, except rough lumber. There were over 500 different items involved, including steel frames, axles, wheels, plumbing and electrical components, aluminum sheeting, plywood, furnaces, refrigerators, air conditioners, mattresses, box springs, sinks, lavatories, commodes, gas and electric ranges, carpeting, linoleum, and many others. James also assumed responsibility for inventory control. He closely observed production operations and the functioning of the overall business to aid him in his handling of purchasing and inventory control. He acknowledged lack of acquaintance with technical concepts of inventory

management, but thoroughly understood the practicalities of his assignment, i. e., that sufficient materials and supplies had to be on hand when needed for manufacturing operations, and that excessive inventories would adversely affect the business. Rapid turnover of inventory is characteristic of successful operations in the mobile home industry.

Plaintiff's Federal income tax returns for the years 1964–1967 reflect the following:

| Year | Beginning inventory | Inventory purchased for manufacture |
|---|---|---|
| 1964 | $192,168 | $5,303,826 |
| 1965 | 216,172 | 4,774,319 |
| 1966 | 297,383 | 4,169,398 |
| 1967 | 303,430 | 3,124,273 |

The inventory at the end of 1967 (same as beginning inventory for 1968) was $341,506. The record in this case discloses no explanation for the steady increases in the dollar volume of inventories. However, based upon all of the factors involved in the successful operation of plaintiff's business, it is concluded that the purchasing of materials and supplies and the control of inventories were reasonably well accomplished.

In addition to the foregoing responsibilities, James Giles assisted to a lesser degree than Ray Neely in supervising production employees. He also hired truckdrivers, and purchased trucks. He supervised the dispatching of trucks to deliver parts to dealers and to bring purchased supplies to plaintiff's plant. He assisted in designing units and in preparing advertising brochures. James participated to a minor extent in sales, directly accounting for about 5 percent of total sales. He also attended the mobile home shows, where he met suppliers and observed their displays.

The three officers involved shared responsibility for some functions. They supervised the frequent repairs required on vehicles, decided replacement of worn-out trucks, occasionally inspected for quality on the assembly line, and even after all five plant foremen were employed, they continued to supervise the production employees. The United Mine Workers organized the employees in 1965, following a 5-week strike, and thereafter all three officers spent considerable time negotiating union contracts, with the aid of an attorney, and handling employee grievances.

Earl Helton, the corporate secretary and only non-relative officer, attended Bowling Green University for almost 2 years, studying bookkeeping and accounting. After 1940, he worked as a bookkeeper earning as much as $125 per week. He joined plaintiff in 1963 and assumed the responsibilities of office manager. His duties included making the payrolls, keeping the ledgers, accounts receivable and accounts payable, and hiring office personnel. He engaged in sales activities for a short period beginning with the resignation of Bernard Rockstadt in 1965, but in early 1966, on his own choice, he returned exclusively to his original responsibilities as office manager.

R. O. Giles determined the amount of compensation the officers and Bernard Rockstadt received. He apparently relied upon his own subjective considerations as to the value of their services. He seemed affected by the fact that in his 1959 search for a superintendent of plant operations, two applicants each proposed compensation at $150 per week and 3 percent of sales. However, he did not hire either applicant because he deemed such compensation excessive.

The three officers involved and Bernard Rockstadt, and for a short period, Earl Helton, received a commission on sales. Such compensation was in addition to basic salary and bonus. The commission, according to plaintiff, was based upon a simple and logical plan. When Rockstadt was hired in 1962 as chief of sales, Giles agreed to pay him one-half of 1 percent of total company sales over the $23,000 per month level then being attained. Rockstadt was not to benefit from Giles' sales efforts up to that time. Ray Neely was originally employed by Giles for $100 per week,

but when he began working in sales in 1963, Giles decided to pay him the same commission as Rockstadt was receiving. James received this same commission from the day he started work in February 1964. Beginning in 1964, Giles also decided, after a discussion with the other officers, that he should receive a commission of 1 percent of total company sales over $23,000 per month. Significantly, Earl Helton received a commission (the same as that of Ray Neely and James Giles) only while he was engaged in direct sales activities after the departure of Rockstadt.

These payments, although termed a "commission," obviously had no relationship to the actual sales attributable to each individual since (1) the percentage was based upon total company sales, and (2) some officers, such as R. O. Giles and James, accounted for only minimal sales. In addition, Rockstadt was the only person precluded from benefiting from sales attributable to someone else's earlier efforts. James Giles, for example, received a commission on all sales over $23,000 a month, even though the total sales in the year before he joined plaintiff, 1963, amounted to $3,827,153.-55. Faced with these circumstances, plaintiff commenced to call the commissions "incentive compensation" at the trial of these cases.

For the years 1964–1967, the amounts of salary, bonus and commission paid to each officer whose total compensation is in issue, as well as those of Earl Helton and Bernard Rockstadt, were as follows:

|  | 1964 | 1965 | 1966 | 1967 |
|---|---|---|---|---|
| **R. O. Giles** | | | | |
| Salary | $13,000.00 | $26,250.00 | $26,000.00 | $26,000.00 |
| Bonus | 10,000.00 | 16,000.00 | 15,000.00 | 15,000.00 |
| Commission | 55,265.09 | 70,425.51 | 59,763.32 | 53,992.77 |
| Total | 78,265.09 | 112,675.51 | 100,763.32 | 94,992.77 |
| **Ray Neely** | | | | |
| Salary | 5,200.00 | 13,100.00 | 13,000.00 | 13,000.00 |
| Bonus | 7,500.00 | 10,500.00 | 10,000.00 | 10,000.00 |
| Commission | 26,170.69 | 33,127.83 | 28,692.73 | 25,599.68 |
| Total | 38,870.69 | 56,727.83 | 51,692.73 | 48,599.68 |
| **James Giles** | | | | |
| Salary | 4,900.00 | 13,100.00 | 13,000.00 | 13,000.00 |
| Bonus | 7,500.00 | 10,500.00 | 10,000.00 | 10,000.00 |
| Commission | 24,670.80 | 34,000.02 | 28,726.93 | 26,618.96 |
| Total | 37,070.80 | 57,600.02 | 51,726.93 | 49,618.96 |
| **Earl Helton** | | | | |
| Salary | 7,150.00 | 8,400.00 | 9,100.00 | 9,100.00 |
| Bonus | 2,000.00 | 2,500.00 | 2,500.00 | 2,500.00 |
| Commission | ------------ | 14,320.76 | 2,500.00 | ------------ |
| Total | 9,150.00 | 25,220.76 | 14,100.00 | 11,600.00 |
| **Bernard Rockstadt** | | | | |
| Salary | 5,200.00 | 2,700.00 | ------------ | ------------ |
| Bonus | 2,000.00 | ------------ | ------------ | ------------ |
| Commission | 31,199.90 | 15,462.25 | ------------ | ------------ |
| Total | 38,399.90 | 18,162.25 | ------------ | ------------ |

■ Plaintiff's expert witness, Robert F. Klumpp, a former partner of Arthur Anderson & Company, knowledgeable on accounting practices in the mobile home industry, testified that a commission based upon sales is an acceptable, if somewhat unsophisticated, manner of compensating officers in that industry. In a closely held corporation, however, where the stockholders are related, a commission on total company sales for general services rendered, paid to the related officers, appears to be an arrangement by which the officer-stockholders

are drawing off some of the corporate profits in the guise of compensation, but not in actuality for personal services rendered. Hampton Corp., 23 CCH Tax Ct.Mem. 899, 902 (1964), aff'd U.S.Tax Cas. (65–2, at 96,616) ¶ 9611 (9th Cir. June 11, 1965); Am-Plus Storage Battery Co. v. Commissioner, 35 F.2d 167, 169 (7th Cir. 1929).

█ As shown by the above table of compensation paid to them, the combined amount of salary and bonus paid to each of the three officers increased markedly for 1965 over 1964. The combined increase for R. O. Giles was $19,250, and for Ray Neely and James Giles, $10,900 each (taking into consideration that James' salary amount in 1964 was not for a full year). Earl Helton, on the other hand, received only a combined increase of $1,750. When R. O. Giles, under cross-examination, was asked to explain the reason for the increased compensation, he was only able to respond that the officers were "worth it." It cannot reasonably be found that the responsibilities of the officers changed substantially during the period involved. The number of units sold by plaintiff increased only slightly from 2,100 in 1964 to 2,239 in 1965, declining thereafter to 2,152 in 1966 and to 1,982 in 1967, and presumably production paralleled these figures during the same years. A plant foreman was hired along with the additional production employees in 1965, and other plant supervisors were added in the remaining years. Two sales clerks were employed in 1965 to take telephone orders. Plaintiff's net sales reached the highest level in 1964 for the 4 years in issue. The sharp increase in the combined salary and bonus for each of the three officers in 1965, thereafter substantially maintained in 1966 and 1967, warrants an inference that the comparatively large payments in 1965–1967 were partially based on factors other than mere compensation for services rendered. Griffin & Company v. United States, 389 F.2d 802, 812, 182 Ct.Cl. 436, 453 (1968).

█ With respect to the substantial bonus paid to each of the three officers in each of the 4 years involved, and bearing in mind their relative stock holdings, consideration is given to the principle that a bonus paid to a nonstockholder employee, which is reasonable, might be unreasonable if paid to a large stockholder, because bonus incentive would presumably not be needed to call forth the stockholder's best efforts. Irby Construction Co. v. United States, 290 F.2d 824, 827, 154 Ct.Cl. 342, 347 (1961).

█ Of course, what constitutes reasonable allowances (for which deductions from plaintiff's taxable income are to be allowed under section 162(a)(1) of the Internal Revenue Code of 1954) for salaries and other compensation paid to the three officers for personal services actually rendered, depends upon all of the facts and circumstances in this case, without any one factor controlling. Jones Bros. Bakery, Inc. v. United States, 411 F.2d 1282, 1285, 188 Ct.Cl. 226, 231 (1969).

Paragraph (a) of Treas.Reg. § 1.162–7, 37 Cum.Bull. (Part 1) 63, 70 (1958), states that the test of deductibility in the case of compensation payments is whether they are reasonable and are in fact purely for services, and in paragraph (b)(3) thereof, it is stated that in any event "the allowance for the compensation paid may not exceed what is reasonable under all the circumstances", and that it is "in general, just to assume that reasonable and true compensation is only such amount as would ordinarily be paid for like services by like enterprises under like circumstances."

This court has recognized and applied the test of compensation paid to similar employees of similar concerns in similar industries, Griffin & Company v. United States, *supra*, but has held that reasonable comparability in its various aspects must be established to prove reasonableness of compensation paid. Northlich, Stolley Inc. v. United States, 368 F.2d 272, 278, 177 Ct.Cl. 435, 444 (1966); R. J. Reynolds Tobacco Co. v. United States, 149 F.Supp. 889, 897, 138 Ct.Cl.

1, 14, cert. denied, 355 U.S. 893, 78 S.Ct. 266, 2 L.Ed.2d 891 (1957).

■ Considerable evidence was presented concerning compensation paid to officers of other mobile home manufacturing companies, but such evidence cannot be accepted as determinative of the reasonableness of officers' compensation in this case, because with respect to some of such companies, incomparability is clearly shown, both with respect to the nature of their operations and the services performed by their officers, and because with respect to the others, there is either insufficient or no proof as to similarity of operations and services performed.

Skyline Homes, Inc., was a giant company in the mobile home manufacturing industry, having 13 plants in 1964, increasing to 24 by 1968, located in various states nationwide. Its president, executive vice president, and treasurer were paid combined salary and bonus in the respective amounts of $65,000, $51,721 and $30,200 for the year ended May 31, 1965; $75,000, $52,040 and $40,012 for fiscal year 1966; $75,000, $84,684 and $50,119 for fiscal year 1967; and $100,000, $130,000 and $75,000 for fiscal year 1968.

Skyline's total number of corporate officers varied from nine in 1964 to six by 1968. Each officer had substantial amounts set aside by the company in a retirement plan, with benefits fully vested after 10 years of employment, and except for the corporate secretary, the company paid premiums on $45,000 term life insurance, payable to the beneficiary named by the officer. Skyline's national sales coordinator was paid between $25,000 and $28,000 annually. Each of Skyline's plants had a plant manager, paid $20,000 to $35,000 per year, a sales manager, paid $18,000 to $20,000 per year, and one to three salesmen. While each plant manager was responsible for the performance of his plant, many responsibilities were centralized in the corporate headquarters, such as purchasing, designing, pricing, accounting, and selection of dealers. The plant and the corporate headquarters worked together in preparing invoices and in conducting transactions with local financial institutions. The duties of the corporate officers of Skyline were executive in nature.

Guerdon Industries, Inc., another nationwide mobile home manufacturing company, had eight plants in 1964, which increased to 19 by 1968. By the latter year, Guerdon employed about 2,900 persons, of whom 2,600 were engaged in manufacturing operations, 75 in sales (including 38 field representatives engaged in the solicitation of orders from dealers) and 225 in administrative duties. Its mobile homes were marketed through approximately 1,200 dealers throughout the United States.

Mr. Robert Meneely, an experienced corporate management official, was president of Guerdon from November 23, 1965, to October 6, 1967. He received direct compensation of $46,654 for the fiscal year ended April 30, 1967. Mr. F. L. Cappaert, chairman of the board of directors of Guerdon, received direct remuneration of $75,000 and $5,250 set aside for his benefit in the company's profit-sharing retirement plan. For the following year, serving as Guerdon's president, Cappaert received the same compensation. Cappaert was a principal stockholder. Meneely owned no stock in Guerdon.

Redman Industries, Inc., had five mobile unit manufacturing plants in 1964, which increased to nine by 1968. Plant managers received a salary of $20,000 to $30,000 per year and a bonus based upon the plant's profits. The highest amount paid to a plant manager during the years in question was just over $50,000. Plant managers were responsible for the profit performance of their plants, and they had to operate within a predetermined budget for labor and other expenses. However, they were not responsible for designing engineering, advertising, purchasing, bookkeeping, accounting, and payroll functions.

During the years in question, Mr. James Redman, holding the title of president and later chairman of the board of directors, was the supervisor of overall operations of Redman. Other officers

included a vice president of finance, responsible for maintaining internal accounting controls, preparing budgets, operating plans and the payroll; a vice president of materials, responsible for negotiating supply contracts, establishing inventory and cost controls, and training the purchasing agents employed by the plants; a vice president of industrial relations, responsible for handling union matters; a vice president of sales; and a vice president of operations.

Redman's officers received as compensation a base salary and a bonus which was based upon a percentage of pre-tax profits. During its fiscal years 1965–1968, the amounts of combined salary and bonus paid to James Redman and the next highest paid officers were as follows:

| Fiscal year ending in March or April | James Redman | 2nd officer | 3rd officer |
|---|---|---|---|
| 1965 | $116,000 | $83,000 | $83,000 |
| 1966 | 97,170 | 67,037 | 67,037 |
| 1967 | 70,329 | 46,804 | 45,971 |
| 1968 | 76,000 | 60,167 | 48,000 |

Parkwood Homes, Inc., began mobile home manufacturing in one plant at Bristol, Indiana, in 1962, added a second plant at Moultrie, Georgia, in 1965 or 1966, and in 1968, opened a third and a fourth plant in Texas and at Middlebury, Indiana. Its overall volume of units sold did not greatly exceed that of plaintiff during the years in question, but similarity of operations ends there. Apparently each plant had a manager, and also a sales manager and one or two salesmen.

Parkwood's president, Raymond F. Bassett, was responsible for all phases of production, the design of the units and the establishment of new plants. He also reviewed all pricing prepared by cost accountants. As vice president, Robert Gaume was primarily responsible for sales, and he also did whatever else was necessary to manage the company, as there were no formal rules delineating responsibilities. As treasurer, Clayton Merrill was responsible for keeping the financial records, paying the bills, handling the payroll and working with the credit manager.

B & J' Woodcraft, Inc. manufactured furniture, counter tops, cabinets, doors and other furnishings and trim for mobile homes. During the years in question, its officers were the same as those of Parkwood, and Parkwood was its primary customer. Parkwood's president and vice president each owned 50 percent of B & J's stock.

Aside from life insurance and retirement benefits provided, Parkwood and B & J paid compensation directly to their three officers as follows:

| Officer | Year ended Feb. 28, 1966 | Year ended Feb. 28, 1967 | Year ended Feb. 28, 1968 |
|---|---|---|---|
| Raymond Bassett | | | |
| Parkwood | $40,000.00 | $56,454.66 | $55,000.00 |
| B & J | 27,845.00 | 40,000.00 | 40,000.00 |
| Total | 67,845.00 | 96,454.66 | 95,000.00 |
| Robert Gaume | | | |
| Parkwood | 40,000.00 | 56,454.66 | 55,000.00 |
| B & J | 27,845.00 | 40,000.00 | 40,000.00 |
| Total | 67,845.00 | 96,454.66 | 95,000.00 |
| Clayton Merrill | | | |
| Parkwood | 15,850.00 | 16,780.00 | 23,000.00 |
| B & J | 2,100.00 | 2,650.00 | 2,600.00 |
| Total | 17,950.00 | 19,430.00 | 25,600.00 |

Sales managers for Parkwood received a salary between $15,000 and $22,000 per year, and a purchasing agent had a beginning salary of between $200 and $225 per week, with more to be paid if he remained with Parkwood.

Skyline, Guerdon, Redman and Parkwood, with their multi-plant operations, their division of responsibilities, and delegation of duties to non-officers, were clearly not comparable in their operations to plaintiff company, and the services performed by their officers were not similar.

Defendant requested findings of fact as to the compensation paid to officers of other mobile home manufacturers, namely, Lonergan Corporation, Fleetwood, Divco-Wayne, Champion, Town and Country, Princess-Zimmer, Commodore, Monarch and Conner. There is no evidence in the record concerning either the duties and responsibilities of the individual officers, or the operations of the companies. It is concluded that the various amounts of such compensation, standing alone, are irrelevant as a measure of the reasonableness of compensation paid to plaintiff's officers.

Although consistently holding that there is no definite formula for determining reasonableness of compensation in any particular instance, and that it is a question of fact to be resolved anew in each case, without any one fact to be considered controlling to the exclusion of all others, Jones Bros. Bakery, Inc. v. United States, *supra,* Irby Constr. Co. v. United States, *supra,* this court nevertheless has recognized and applied performance ratios, based on financial statistics, as guides in deciding reasonableness of compensation of corporate officers. Boyd Constr. Co. v. United States, 339 F.2d 620, 168 Ct.Cl. 579 (1964); Gordy Tire Co. v. United States, 296 F.2d 476, 155 Ct.Cl. 759 (1961).

In support of its position that the full amounts of compensation paid to its president, vice president and treasurer were reasonable and deductible in computing its taxable income, plaintiff relies heavily on performance ratios of plaintiff and 15 other companies, computed by Robert F. Klumpp. The other companies were those which were engaged, as was plaintiff, primarily in the manufacturing of mobile homes, as opposed to travel trailers, and which filed documents with the Securities and Exchange Commission, setting forth financial data as to their operations in the years 1964–1967. Mr. Klumpp considered these 15 companies (referred to herein as the larger group of other companies) representative of the industry, because their combined sales amounted to 39 percent in 1966 and 48 percent in 1967 of the total sales in the United States. Of these 15 manufacturers, Mr. Klumpp considered nine of them (herein referred to as the smaller group of other companies) comparable to plaintiff, because each of the nine had sales in 1964 less than $20,000,000, thus excluding the giants of the industry.

Plaintiff asserts that four sets of performance ratios, computed by Mr. Klumpp from the financial data relating to the years 1964–1967, are the most important to prove the reasonableness of compensation paid to its officers. Each percentage stated herein is the weighted average per year for the 4 years.

First, after allowing all of the compensation paid by plaintiff to its officers in computing pre-tax income, plaintiff's average annual pre-tax income was 8.05 percent of its net sales, compared to 4.4 percent attained by the larger group, and 5.3 percent by the smaller group of other companies.

Second, the average annual return on invested capital (after-tax net income as a percentage of beginning stockholders' investment) was 72 percent for plaintiff, 20.6 percent for the larger group, and 39.3 percent for the smaller group of other companies.

Third, during three of the years involved, plaintiff extended a total of $101,215.12 to R. O. Giles as loans. The

Internal Revenue Service treated these disbursements as dividends. This determination was contested by R. O. Giles by the filing of two petitions in this court, and his individual cases were consolidated with subject cases. At the outset of the trial, plaintiff and R. O. Giles conceded the correctness of the dividend determination, and the individual suits brought by R. O. Giles were subsequently dismissed by stipulation of the parties. No other amounts of money were distributed by plaintiff as dividends since its formation. These disbursements amounted to an average annual 6.-85 percent of plaintiff's beginning stockholders' investment over the 4-year period involved, compared to an average annual cash dividend of 5.23 percent for the larger group of other companies and 4.25 for the smaller group.

Fourth, the corporate Federal income tax returns of four mobile home manufacturers show that each of such companies paid as compensation to its officer and non-officer sales and administrative personnel a higher average annual percentage of pre-tax pre-compensation income than plaintiff did. Redman, Lonergan, Parkwood, and Skyline paid respectively 52.03, 49.59, 45 and 36.49 percent, while plaintiff paid 33.14 percent.

Relying on R. J. Reynolds Tobacco Co. v. United States, *supra*, defendant argues that plaintiff's performance ratios are useful only as an investment analysis and that they fail to establish the worth of the services of the individual officers. In *Reynolds*, this court held that reasonableness of officers' compensation was not shown by comparison of the total amount paid by the taxpayer with the aggregate amount paid by each of its three competitors, without proof of the duties and responsibilities of individuals doing like jobs. In subject case, plaintiff's officers performed duties clearly not comparable to those of the officers of Redman, Parkwood and Skyline, and no evidence was introduced to show the duties of Lonergan's officers. However, it is established that as

a group, the officer, sales and administrative personnel perform similar functions in both large and small mobile manufacturing companies. While the fourth set of ratios does not prove the reasonableness of compensation paid to any one officer, it does tend to show the reasonableness of compensation paid for all officer, sales and administrative services, and thus to place in proper perspective the compensation paid to officers of a small company, who performed extensively duties usually assigned to non-officer personnel in large companies.

In the alternative to its basic position that plaintiff failed to prove that the amounts paid to its officers represented reasonable compensation for their services, defendant argues that under the formula utilized in Charles McCandless Tile Service v. United States, 422 F.2d 1336, 191 Ct.Cl. 108 (1970), 15 percent of plaintiff's net profits (before Federal income tax and compensation paid to the officers involved) should be considered a return on equity capital and a distribution of corporate earnings, and to that extent not deductible as officers' compensation. *McCandless*, however, is clearly distinguishable from subject case. There, the court expressly stated that no precise formula was available to strike a balance between compensation and investment-return in the closely held corporation, and it was only after an examination of the entire record that the court concluded that a return of equity capital of 15 percent was reasonable. Each of the two stockholder-officers owned 50 percent of the corporate voting stock, and each received identical compensation, which amounted to 50 percent of the net profits (before Federal income tax and the two officers' compensation) during each of the 3 years involved. Moreover, in *McCandless*, the company never paid dividends, in any form, to its stockholders.

In subject case, three of plaintiff's four officers were stockholders. Two of the five stockholders were not officers. The compensation paid to the three

stockholder-officers was not proportional to their respective stockholdings. The president held 12 times the number of shares of either the vice president or the treasurer. The president's compensation was about twice that of either the vice president or the treasurer, with the latter two owning the same number of shares and receiving about the same compensation. The compensation paid to the three officers amounted to about 27.6 percent of plaintiff's net profits (before their compensation and Federal income tax) over the period involved. Moreover, plaintiff paid dividends as previously described. In short, clear factual differences preclude the application of the *McCandless* formula herein.

■ After consideration of the cited cases in the light of all of the evidence adduced in the trial of this case, it is concluded that in computing plaintiff's taxable income in each of the years 1964–1967, plaintiff is entitled pursuant to section 162(a)(1) of the Internal Revenue Code of 1954 to deductions, as reasonable allowances for salaries and other compensation paid for personal services actually rendered, in the amount of $75,000 per year for its president, R. O. Giles $37,500 per year for its vice president, Ray Neely, and $25,000 for 1964 and $37,500 for each of the years 1965–1967 for its treasurer, James Giles. By 1964, R. O. Giles and Ray Neely were thoroughly experienced in the handling of plaintiff's business. James Giles was inexperienced when he commenced his employment with plaintiff in 1964, and spent several months in training before assuming primary responsibility for purchasing and inventory control of supplies and materials.

Entry of judgment should be deferred until the amounts of recovery on plaintiff's petitions and defendant's counterclaims have been determined in further proceedings pursuant to Rule 131, to permit offsetting of the amounts of recovery to arrive at a net judgment in favor of the party entitled to recover the larger sum.

DAVIS, Judge (concurring):

I am satisfied that the compensation allowed by the Internal Revenue Service was wholly inadequate for R. O. Giles and probably too low for the other two officers. Conversely, I am satisfied that the compensation paid by the taxpayers was unreasonably high for each of the officers, and substantially in excess of reasonable pay. The trial judge's figures appear somewhat high (especially for R. O. Giles), and to my mind probably represent the maximum allowable under § 162(a)(1). The defendant has not, however, made any real effort to support any sums lying in between those used by the IRS and those determined by the trial judge; it has insisted almost entirely on the correctness of the IRS decision, without giving the court any substantial alternative bases for higher figures (which would still be less than those of the trial judge).

## FINDINGS OF FACT

1. Plaintiff, a corporation organized in Tennessee in 1959, is engaged primarily in the manufacture and sale of mobile homes. The corporate headquarters and plant, originally located in Tazewell, Tennessee, were transferred to Middlesboro, Kentucky in September 1962.

2. From 1964 through 1967, plaintiff had 1,100 shares of issued and outstanding capital stock owned by five persons, each holding the following number of shares:

|  | 1964 | 1965–1967 |
|---|---|---|
| R. O. Giles | 960 | 840 |
| Ray Neely | 40 | 70 |
| Dorothy Neely | 30 | 60 |
| James Giles | 40 | 70 |
| Maxine Giles | 30 | 60 |

R. O. Giles is the father of both James Giles and Dorothy Neely. Maxine is the wife of James Giles, and Ray Neely is the husband of Dorothy.

3. During the years 1964 through 1967, plaintiff using the accrual method of accounting, filed its Federal income

tax returns on a calendar year basis reflecting the following taxable income and tax:

| Year | Taxable Income | Income Tax |
|------|---------------|------------|
| 1964 | $328, 216. 98 | $155, 714. 37 |
| 1965 | 309, 220. 19 | 141, 125. 92 |
| 1966 | 431, 793. 01 | 200, 656. 10 |
| 1967 | 962, 854. 91 | 453, 933. 96 |

Plaintiff paid the tax shown on each return.

4. (a) Upon audit of plaintiff's tax returns, the Internal Revenue Service assessed the following deficiencies:

| Year | Deficiency |
|------|-----------|
| 1964 | $43, 942. 35 |
| 1965 | 152, 327. 21 |
| 1966 | 59, 254. 60 |
| 1967 | 52, 370. 07 |

Plaintiff paid the deficiencies plus interest for the years 1964 and 1965.

(b) Plaintiff filed timely claims for refund for the years 1964 and 1965, and after more than 6 months elapsed without an allowance or disallowance, plaintiff timely filed its petition herein (Docket No. 140–68) with respect to those years.

(c) Plaintiff also filed timely claims for refund of a portion of the tax it had paid with its 1966 and 1967 returns, and after more than 6 months elapsed without an allowance or disallowance, plaintiff timely filed its petitions herein (Docket Nos. 76–69 and 337–69) with respect to those years.

(d) Defendant counterclaimed for the unpaid deficiencies, assessed after commencement of the latter two cases, for the years 1966 and 1967.

5. These cases were consolidated, and on October 22, 1971, the parties filed a stipulation that all issues but one had been settled by agreement of the parties. The only remaining issue to be tried and determined by the court is the extent of deductibility of officers' compensation paid by plaintiff to R. O. Giles, Ray Neely and James Giles in computing plaintiff's taxable income for each of the 4 years in question. The parties stipulated that the amount of refund to which plaintiff might be entitled or the amount of additional deficiency which it may owe should be determined under Rule 131(c)(2) on the basis of the disposition of the compensation issue by the court and the agreement on the other issues.

6. Plaintiff paid to the named individuals and deducted, for Federal income tax purposes, the following amounts as compensation for personal services rendered:

| | 1964 | 1965 | 1966 | 1967 |
|---|------|------|------|------|
| R. O. Giles | $78, 265. 09 | $112, 675. 51 | $100, 763. 32 | $94, 992. 77 |
| Ray Neely | 38, 870. 69 | 56, 727. 83 | 51, 692. 73 | 48, 599. 68 |
| James Giles | 37, 070. 80 | 57, 600. 02 | 51, 726. 93 | 49, 618. 96 |
| Helton | 9, 150. 00 | 25, 220. 76 | 14, 100. 00 | 11, 600. 00 |
| Rockstadt | 38, 399. 90 | 18, 162. 25 | | |

During this period, plaintiff's corporate officers were: R. O. Giles, president; Ray Neely, vice president; James Giles, treasurer; and Earl Helton, secretary. Bernard Rockstadt, a non-officer, was plaintiff's chief of sales until he resigned in the middle of 1965. The amounts of compensation paid to Helton and Rockstadt are not in issue.

7. In assessing the deficiencies, the Internal Revenue Service determined that under § 162 of the Internal Revenue Code of 1954, no more was allowable as reasonable compensation for personal services rendered by the three officers involved (R. O. Giles, Ray Neely and James Giles) than $25,000 each annually for the years 1964, 1966 and 1967 and

$25,220.76 each for the year 1965. The remainder of the compensation paid to these officers was, thus, disallowed as deductions.

8. (a) During three of the years, plaintiff disbursed the following additional monies to R. O. Giles:

| | |
|---|---|
| 1964 | $12,840.66 |
| 1965 | 83,043.80 |
| 1966 | 5,330.66 |
| | 101,215.12 |

Both plaintiff and R. O. Giles treated these disbursements as loans. However, the Internal Revenue Service in its audit treated such amounts as dividends paid by plaintiff to its stockholder, R. O. Giles. This determination was contested by R. O. Giles by the filing of two petitions in this court. His individual cases were consolidated with plaintiff's, but at the outset of trial, both plaintiff and R. O. Giles conceded that the Internal Revenue Service was correct in treating such disbursements as dividends. This concession was accepted by defendant and by the trial judge, and after the trial the individual cases brought by R. O. Giles were dismissed by stipulation of the parties.

(b) No other amounts of money were distributed by plaintiff as dividends since its formation.

9. Between 1962, the year plaintiff began operations on a larger scale in Kentucky, and 1967, production in the mobile home industry steadily increased. The 1962 production of 118,673 units was more than doubled by 1967 when 245,804 units were manufactured in the United States. The industry experienced a drop in production in only one year, 1966, attributed to a tight money market. The mortality rate of mobile home manufacturers was high, however, with one out of every three manufacturers going broke. To enter the industry required a relatively low capital investment, but the dollars invested had to be turned over fast, and management had to be sharp and alert. Sixty-five to 70 percent of the sales price represented purchased material, so acquiring material at the best price obtainable and having it at the right place at the right time to build the units was essential. The practice in the industry was to pay little or no dividends, particularly in smaller companies that needed to retain earnings to finance growth. As the years went by, the manufacturers became more efficient, and the units increased in size while the cost per square foot of floor space declined.

10. Plaintiff began constructing mobile homes in early 1960 on a very small basis in a 37,000 square foot plant located in Tazewell, Tennessee. It had only two officers, R. O. Giles as president, and Dallie Keck, a bookkeeper, as secretary. Plaintiff's first mobile homes, priced around $4,300 per unit, were too expensive and consequently, did not sell well. Since 1961, plaintiff has concentrated on building low-cost mobile homes which were more suitable to the surrounding market area. In September 1962, it moved to a larger plant, purchased at an auction, located in Middlesboro, Kentucky, having a floor space of 60,000 square feet. This plant was enlarged to about 100,000 square feet in 1963 and to 180,000 square feet by 1965.

11. By 1964, plaintiff was manufacturing five different models of mobile homes. It added a sixth model in 1965. Each model had between 13 and 20 available floor plans, rearranging rooms and other space. In late 1967, plaintiff first began producing travel trailers, in five different models. All the mobile homes and travel trailers were constructed on an assembly line, where, as the units were moved from station to station, the floor, sidewalls, partitions, cabinets, roof, doors, windows, trimming and appliances were added. The assembly line operated on a one-shift, 40-hour week, completing approximately nine units each working day between 1964 and 1967.

12. (a) Plaintiff sold the following number of units through 100 to 125 in-

dependent dealers located in 20 to 22 surrounding states:

| Year | No. of Units |
|------|------|
| 1964 | 2, 100 |
| 1965 | 2, 239 |
| 1966 | 2, 152 |
| 1967 | 1, 982 |

Plaintiff delivered these units within a geographical area extending 500 miles from the Middlesboro plant, utilizing its own trucks and drivers. Its 40 trucks, of which 20 to 30 were regularly on the road, traveled about 4,000,000 miles a year.

(b) Plaintiff's units sold at a price substantially less than comparable models of other manufacturers. For example, in 1964, plaintiff's units ranged in price from. $2,695 to $4,595, compared with the largest manufacturer's range on similar models of $2,895 to more than $6,000. Plaintiff's average selling price per unit declined from $3,270 in 1964 to $2,840 in 1967. Plaintiff was able to sell at these prices because of (1) its efficient operations, (2) its elimination of some accessories which other manufacturers included on their units, and (3) its cheaper labor costs from a market of unskilled workers which existed in the vicinity of plaintiff's operations.

13. Plaintiff's net sales (gross sales less returns), pre-tax income and after-tax income (after officers' compensation as paid) were as follows:

|  | 1960 | 1961 | 1962 | 1963 |
|------|------|------|------|------|
| Net sales | $276,828.01 | $246,668.72 | $1,231,441.75 | $3,827,153.55 |
| Pre-tax income | (17,064.18) | 692.73 | 24,320.47 | 38,777.88 |
| After-tax income | | 692.73 | 23,858.04 | 24,799.71 |

|  | 1964 | 1965 | 1966 | 1967 |
|------|------|------|------|------|
| Net sales | $6,776,757.87 | $6,733,608.12 | $6,159,265.49 | $5,629,603.98 |
| Pre-tax income | 321,104.80 | 455,731.47 | 322,918.51 | 937,808.88 |
| After-tax income | 161,836.27 | 239,942.61 | 172,055.93 | 489,641.90 |

Except for the dividends paid to R. O. Giles and described in finding 8, all after-tax income has been retained by plaintiff.

14. During the years 1964–1967, plaintiff operated with the following personnel:

(a) *Management.* The four officers, R. O. Giles, Ray Neely, James Giles and Earl Helton constituted the entire management staff.

(b) *Administrative personnel.* The total number varied from 5 to 7 such employees. In addition to Bernard Rockstadt, the chief of sales, they were a secretary-receptionist, an inventory clerk, two to three office clerks and two sales and dispatching clerks. The inventory clerk and the sales and dispatching clerks assisted the officers involved, while the secretary-receptionist and the office clerks assisted Earl Helton, whose compensation is not in issue.

(c) *Production employees and truck-drivers.* The total number varied from year-end forces of 119 in 1964; 212 in 1965; 221 in 1966; to 212 in 1967. The truckdrivers constituted about 20 to 30 of these employees. As a result of the plant expansion and added employees, plaintiff hired its first supervisor, a plant foreman, in 1965. A plant inspector was added in 1966, and four additional plant foremen were hired in 1967.

15. (a) R. O. Giles (hereinafter sometimes called by his last name), plaintiff's founder and president, is a native Tennessean, residing in Tazewell,

Tennessee, a mountainous, coal mining region just over the border from Middlesboro, Kentucky. He was born in 1906 and was 58 to 61 years of age during the years involved. His formal education ended at the sixth grade of schooling. Commencing in 1925, he owned and operated various businesses, including a country store, a tomato canning operation, a farm, a sawmill, home construction, a planing mill, a lumber yard, an automobile distributorship and garage, and a cedar manufacturing shop which produced bedroom suites, wardrobes and chests.

(b) In 1959, Giles enlarged the floor space of his cedar shop, purchased machinery necessary to manufacture mobile homes from two locations in Michigan, installed the equipment and organized plaintiff corporation. In the same year, he made several trips to Elkhart, Indiana where he conferred with three men about employing a supervisor for plaintiff's planned operations. Only one man, the superintendent of another mobile home manufacturer, proved a possible candidate. This man, whose name Giles was unable to recall, later visited Giles' cedar shop which was then in the process of being enlarged and proposed to run plaintiff's operations for $150 per week salary and 3 percent of sales. The plant manager for Troy Industries in Troy, North Carolina, also approached Giles with the same proposal. Giles did not learn what compensation these men were then receiving, but he was convinced that they were asking too much, and he therefore, made no offers of employment. During that year, Giles finally hired Bernard Rockstadt at $125 per week, a nonrelative, who had worked for another mobile home company in Tennessee, to oversee plaintiff's operations. Rockstadt was not knowledgeable in the manufacturing process so he and Giles together learned how to construct the units. They built and rebuilt the first mobile home three times before completing it. Using knowledge he gained from his previous construction experiences, Giles supervised all the additions and expansions to his original cedar shop and later, the plant in Kentucky. Giles used plaintiff's masons and welders to construct the additions to the plant and he received no assistance from architects, engineers or contractors. Bernard Rockstadt resigned and worked for another manufacturer until 1962 when Giles rehired him to take charge of sales.

(c) During the period in question, R. O. Giles functioned not just as titular chief executive, but as the real head of the company. He was the person responsible for the organization, commencement and development of the business to the status of operations attained in the years in issue, and he remained its active leader throughout the period directly concerned in this case. He determined basic policy, although some decisions were made in consultation with the vice president and the treasurer. He participated in every facet of the business. Most of his time was spent supervising the production workers, showing them how to build the units, and instructing them on such things as how to rip lumber; set-up, file and repair saws; weld; plumb; and operate the dust collecting system. Skilled labor, such as plumbers, carpenters and electricians were in short supply, so Giles, who personally interviewed and hired each production employee, had to make sure the unskilled workmen could learn the jobs. He also supervised the installation of new machinery such as sanders, planers, double end tenders, brakes and rigidizers. Giles felt that his presence in the plant increased production and decreased waste. Although he preferred to have the officers oversee production, he was eventually forced to employ plant supervisors. He reluctantly added the four plant foremen in 1967 at the insistence of Ray Neely and James Giles (hereinafter sometimes called by his first name), who felt that additional supervisors would increase efficiency. Giles was also under pressure from the employees' union which objected to the three officers working with or directly supervising the production employees. Another major responsibility

he handled was the purchasing of all the machinery and rough lumber used in the business. He also assisted in designing new mobile home models and in making changes in the floor plans of the existing models. Giles' direct participation in sales was limited to taking incoming telephone orders when other personnel were not in the office, and to meeting occasional visitors to the plant, sometimes taking them to plaintiff's local dealer for accomplishment of sales.

16. (a) Ray Neely, plaintiff's vice president, finished high school, worked on a farm, was employed by Southern Railway, and was engaged in the service station and trucking business before he joined plaintiff in 1961. He earned as much as $120 per week in these endeavors. Although he had no previous experience in the mobile home business, Giles employed him to assist in purchasing materials, inventory control and supervising production. In time, he assumed primary responsibility for the purchasing and inventory functions, and continued handling them until James Giles was hired in February 1964. After being trained by Neely for several months, James Giles was assigned such matters.

(b) Beginning in 1963, Ray Neely worked extensively in sales, in cooperation with Bernard Rockstadt, and when the latter resigned in mid-1965, Neely became primarily responsible for sales. Sales were conducted generally over the telephone, and dealers called plaintiff to place orders, sometimes for as many as 10 units. Two clerks, employed in 1965, assisted by taking telephone orders, lessening the effect of Rockstadt's departure. Sales activities also consisted of visiting dealers and supplying them with advertising brochures, and attending out-of-state mobile home shows four to five times each year. Sales incentives such as rebates were provided to dealers who attained prescribed sales levels.

(c) Ray Neely, to a lesser extent than R. O. Giles, supervised production workers. With the aid of the latter, Neely designed the new model of mobile home introduced in 1965, planned rearrangements of floor spaces on all models, and

also designed the five models of travel trailers in 1967. Neely priced the units sold, using a bill of materials furnished by James Giles, and adding labor, overhead, profit and hidden costs to arrive at profitable wholesale prices. Neely's other responsibilities included preparing advertising brochures, collecting payments from dealers, conducting transactions with banks, and hiring truckdrivers. He was also in charge of dispatching of deliveries of units to dealers, selecting highway routes, securing roaduse permits, distributing fuel stickers, and directing departure of trucks early in the morning.

17. (a) James Giles, plaintiff's treasurer, completed high school and thereafter owned and operated a refrigerator sales and service business for 3 or 4 years. He earned about $6,000 to $7,000 a year before his employment by plaintiff in February 1964. He had had no experience in the mobile home business. Giles hired him to work primarily in purchasing and inventory control, and to learn the overall business.

(b) During 1964, Ray Neely assisted James in purchasing for several months until James learned the function sufficiently to take over the complete responsibility. Purchasing was conducted primarily over the telephone, although suppliers also visited plaintiff's office. James bought all of the materials, supplies, equipment, and appliances for the mobile homes, except rough lumber. There were over 500 different items involved, including steel frames, axles, wheels, plumbing and electrical components, aluminum sheeting, plywood, furnaces, refrigerators, air conditioners, mattresses, box springs, sinks, lavatories, commodes, gas and electric ranges, carpeting, linoleum, and many others. James constantly shopped for the lowest prices, inviting suppliers to sell for less than prices quoted by others. James also assumed the responsibility for inventory control. He closely observed production operations and the functioning of the overall business to aid him in his handling of purchasing and inventory control. He acknowledged lack of ac-

quaintance with technical concepts of inventory management, but thoroughly understood the practicalities of his assignment, i. e., that sufficient materials and supplies had to be on hand when needed for manufacturing operations, and that excessive inventories would adversely affect the business. Rapid turnover of inventory is characteristic of successful operations in the mobile home industry.

(c) Plaintiff's Federal income tax returns for the years 1964–1967 reflect the following:

| Year | Beginning inventory | Inventory purchased for manufacture |
|---|---|---|
| 1964 | $192, 168 | $5, 303, 826 |
| 1965 | 216, 172 | 4, 774, 319 |
| 1966 | 297, 383 | 4, 169, 398 |
| 1967 | 303, 430 | 3, 124, 273 |

The inventory at the end of the 1967 (same as beginning inventory for 1968) was $341,506. The record in this case discloses no explanation for the steady increases in the dollar volume of inventories. However, based upon all of the factors involved in the successful operation of plaintiff's business during the 4 years involved, it is concluded that the purchasing of materials and supplies and the control of inventories were reasonably well accomplished.

(d) In addition to the foregoing responsibilities, James Giles assisted to a lesser degree than Ray Neely in supervising production employees. He also hired truckdrivers, and purchased trucks. He supervised the dispatching of trucks to deliver parts to dealers and to bring purchased supplies to plaintiff's plant. He assisted in designing units and in preparing advertising brochures. James participated to a minor extent in sales, directly accounting for about 5 percent of total sales. He also attended the mobile home shows, where he met suppliers and observed their displays.

18. The three officers involved shared responsibility for some functions. They supervised the frequent repairs required on the vehicles, decided replacement of worn-out trucks, occasionally inspected for quality on the assembly line, and even after all five plant foremen were employed, they continued to supervise the production employees. The United Mine Workers, district 50, organized the employees in 1965, following a 5-week strike, and thereafter, all three officers spent considerable time negotiating union contracts (although they were aided by an attorney) and handling employee grievances.

19. R. O. Giles devoted 12 hours a day, 6 days a week to plaintiff's operations. Ray Neely worked from 12 to 15 hours a day, 6 or 7 days a week, beginning at 6:30 or 7:00 a. m. each morning. James worked an average of 50 to 60 hours over a 5- or 6-day week. These three officers were on call at all times for emergencies such as truck accidents or breakdowns, service complaints, winter floods in the plant and fire alarms. They worked on weekends when dealers visited the plant and at night negotiating contracts with suppliers and negotiating union agreements.

20. Earl Helton, the corporate secretary and the only nonrelative officer, attended Bowling Green University, for almost 2 years, studying accounting and bookkeeping. After 1940, he worked as a bookkeeper earning as much as $125 per week. He joined plaintiff in 1963 and assumed the responsibilities of office manager. His duties included making the payrolls, keeping the ledgers, accounts receivable and accounts payable, and hiring office personnel. He engaged in sales activities for a short period beginning upon the resignation of Bernard Rockstadt in the middle of 1965. Sometime during the early part of 1966, Earl Helton decided to forego sales activities and to return exclusively to his original responsibilities as office manager.

21. During the years involved, two mobile home manufacturers, Redman Industries and Skyline Homes, Inc., and a conglomerate, U. S. Industries, showed an interest in acquiring plaintiff. U. S. Industries, however, was the only organization to pursue the matter, and then only to the point of looking over plaintiff's books and discussing

the current compensation of plaintiff's officers. Although plaintiff's officers could not recall with whom they spoke from U. S. Industries, they remembered that the representative was scouting to acquire plants and that he was unfamiliar with the mobile home industry. No offer of purchase was forthcoming from any of these organizations.

22. (a) R. O. Giles determined the amount of compensation the officers and Bernard Rockstadt received. He apparently relied upon his own subjective considerations as to the value of their services.

(b) The three officers involved, Bernard Rockstadt, and for a short period, Earl Helton, received a commission on sales. This commission, according to plaintiff, was based upon a simple and logical plan. When Bernard Rockstadt was hired in 1962 as chief of sales, R. O. Giles agreed to pay him a commission of one-half of 1 percent of total company sales over the $23,000 a month level then being attained. Bernard Rockstadt was not to benefit from Giles' sales efforts up to that date. Ray Neely was originally employed by Giles for $100 per week. When he began working in sales in 1963, R. O. Giles decided to pay him, and plaintiff did thereafter pay him, the same commission as Bernard Rockstadt

was receiving. James received this same commission from the day he started work in 1964. In that same year, R. O. Giles decided, after a discussion with the other officers, that he should receive a commission of 1 percent of total company sales over $23,000 per month. Earl Helton received the same commission as did Ray Neely and James, but only while he was engaged in direct sales activities after the departure of Bernard Rockstadt. At the trial of these cases, plaintiff called these commissions "incentive compensation," although plaintiff's officers had always described them as "commissions" in both conversations and on plaintiff's books and records.

(c) The officers and Bernard Rockstadt also received a salary and an annual bonus. Rockstadt was paid a smaller bonus than the three officers involved in 1964 and no bonus in 1965 as Giles was displeased that he was considering resigning to go into competition with plaintiff. The salary and the annual bonus of the officers were increased in 1965. When R. O. Giles, under cross-examination, was asked to explain this increase, he was only able to say that he thought the officers were "worth it."

(d) The compensation paid to the named individuals is as follows:

| | 1964 | 1965 | 1966 | 1967 |
|---|---|---|---|---|
| **R. O. Giles** | | | | |
| Salary | $13,000.00 | $26,250.00 | $26,000.00 | $26,000.00 |
| Bonus | 10,000.00 | 16,000.00 | 15,000.00 | 15,000.00 |
| Commission | 55,265.09 | 70,425.51 | 59,763.32 | 53,992.77 |
| Total | 78,265.09 | 112,675.51 | 100,763.32 | 94,992.77 |
| **Ray Neely** | | | | |
| Salary | 5,200.00 | 13,100.00 | 13,000.00 | 13,000.00 |
| Bonus | 7,500.00 | 10,500.00 | 10,000.00 | 10,000.00 |
| Commission | 26,170.69 | 33,127.83 | 28,692.73 | 25,599.68 |
| Total | 38,870.69 | 56,727.83 | 51,692.73 | 48,599.68 |
| **James Giles** | | | | |
| Salary | 4,900.00 | 13,100.00 | 13,000.00 | 13,000.00 |
| Bonus | 7,500.00 | 10,500.00 | 10,000.00 | 10,000.00 |
| Commission | 24,670.80 | 34,000.02 | 28,726.93 | 26,618.96 |
| Total | 37,070.80 | 57,600.02 | 51,726.93 | 49,618.96 |
| **Earl Helton** | | | | |
| Salary | 7,150.00 | 8,400.00 | 9,100.00 | 9,100.00 |
| Bonus | 2,000.00 | 2,500.00 | 2,500.00 | 2,500.00 |
| Commission | | 14,320.76 | 2,500.00 | |
| Total | 9,150.00 | 25,220.76 | 14,100.00 | 11,600.00 |
| **Bernard Rockstadt** | | | | |
| Salary | 5,200.00 | 2,700.00 | | |
| Bonus | 2,000.00 | | | |
| Commission | 31,199.90 | 15,462.25 | | |
| Total | 38,399.90 | 18,162.25 | | |

(e) The remaining administrative and supervisory employees were paid by salary only. The two sales and dispatching clerks each received between $7,300 and $8,800 a year, the inventory clerk between $5,325 and $6,730, and the plant foremen each about $5,500 annually. The maximum salary of the secretary-receptionist was $6,730, and that of each of the three office clerks was $4,900.

23. (a) Skyline Homes, Inc. (hereinafter referred to as Skyline) was a giant in the industry during the period in question. Its prospectus, dated April 1, 1964, describes the company as having 13 plants, nine officers and 857 personnel. Skyline's 1968 annual report shows that it grew to 24 plants while reducing its number of officers to six. The plants, located in California, Kansas, Louisiana, Idaho, Georgia, Florida, North Carolina, Pennsylvania and Indiana, had a total floor space of 1,300,000 square feet. Twenty administrative personnel worked in the corporate headquarters located in Elkhart, Indiana, and seven or eight sales and administrative employees worked in each plant.

(b) Arthur Decio, the president of Skyline, began working with its predecessor corporation, started by his father in the early 1950's, and later Decio and his brother acquired his father's interest. As the head of the company, Decio provided leadership in all areas of concern. He worked with the various departments, such as marketing, design and cost, to develop mobile homes that would meet price levels and still have sales appeal. Decio made the final decisions on whether to extend credit to dealers and he reviewed all financial reports prepared by the treasurer. He visited the plants on an as-needed basis to solve problems and to improve public and employee relations.

(c) Dale Swikert, an executive vice president, was in charge of the Pacific group (Skyline's west coast operations). Because of his business talents, the plants under his supervision experienced increased sales and profitability.

(d) Ronald Kloska, a certified public accountant, joined Skyline in 1963 and shortly thereafter was elected treasurer. He was awarded a philosophy degree from the University of Montreal and a masters in business administration from the University of Michigan. He served as an officer in the U. S. Army Finance Corp from 1957 to 1960, and afterwards was employed as an auditor by an accounting firm. As Skyline's treasurer, he was responsible for accounting and comptrollership functions. When Kloska was elected vice president in 1965 and executive vice president in 1967, in addition to treasurer, he assumed additional supervisory responsibilities over cost, credit and purchasing functions.

(e) Other officers in 1964 included an executive vice president, four other vice presidents in charge of sales, purchasing, operations, and research and development respectively, and a secretary. Other officers in 1968 included an executive vice president in charge of eastern operations, an assistant treasurer and a secretary. Each of the other officers received substantial compensation.

(f) Skyline's plants were more properly categorized as assemblers rather than manufacturers of mobile homes. All the component parts were purchased and then fitted together on the assembly line. The only items it fabricated were wood and cabinet work. Each plant had a plant manager, a sales manager and one to three salesmen. The plant manager was responsible for the performance of his plant. Many responsibilities such as purchasing, designing, pricing, accounting, bookkeeping, preparing the payroll and selecting dealers were performed by personnel in the corporate headquarters. The plant and the corporate headquarters worked together in preparing invoices and in conducting transactions with local financial institutions. Skyline maintained a low inventory with a rapid turnover, controlled by the taking of a quarterly inventory rather than the use of perpetual records.

(g) The officers and plant managers worked approximately 45 to 55 hours per week.

(h) The officers were compensated with a salary and a bonus. The bonus committee, which met soon after the end of the fiscal year, used a formula related to return on invested capital and considered the performance of the individual officers. A "profit sharing and retirement" plan to which Skyline contributed was provided for the officers, sales and administrative employees. The participant's share in this plan grew and became more vested each year. If a participant retired or his employment terminated, for whatever reason, after 10 years, he was entitled to 100 percent of the monies accrued to him. Skyline also paid premiums on term life insurance, in the amount of $45,000, for each officer, except the secretary. Each officer could choose his own beneficiary. If Decio were to die while serving as an employee, his survivors were to receive $50,000 a year, for 10 years, from Skyline. Proxy statements dated August 9, 1965, July 5, 1967, and July 16, 1968, and an exhibit in evidence show the following compensation paid directly and set aside in the retirement plan to Decio, Swikert and Kloska:

| Year ending | Decio | Swikert | Kloska |
|---|---|---|---|
| *May 31, 1965* | | | |
| Direct | $65,000 | $51,721 | $30,200 |
| Set aside | 15,049 | 8,237 | *N/A |
| Total | 80,049 | 59,958 | 30,200 |
| *May 31, 1966* | | | |
| Direct | 75,000 | 52,040 | 40,012 |
| Set aside | N/A | N/A | N/A |
| Total | 75,000 | 52,040 | 40,012 |
| *May 31, 1967* | | | |
| Direct | 75,000 | 84,684 | 50,119 |
| Set aside | 7,949 | 10,963 | 7,507 |
| Total | 82,949 | 95,647 | 57,626 |
| *May 31, 1968* | | | |
| Direct | 100,000 | 130,000 | 75,000 |
| Set aside | 52,661 | 34,842 | 16,475 |
| Total | 152,661 | 164,842 | 91,475 |

*(N/A—not available)

The average plant manager received between $20,000 and $35,000 based upon a salary and a percentage of pre-tax income of his plant. A national sales coordinator, who assumed the responsibilities of the vice president in charge of sales, received between $25,000 and $28,000 a year. The plant sales managers were paid $18,000 to $20,000 a year.

(i) Skyline, with its multi-plant operations, its division of responsibilities, and delegation of duties to non-officers, was clearly not comparable in its operations to plaintiff, and the services performed by its officers were not similar.

24. (a) Guerdon Industries, Inc. (hereinafter referred to as Guerdon) was another giant in the mobile home manufacturing industry during the years in question. Its annual report for the year ended March 31, 1964 describes the company as having eight plants and five officers. Guerdon's prospectus, dated February 5, 1968, shows that it grew to 19 plants and had five officers, all of whom were different from the officers in 1964. Its plants were located in California, Kansas, Idaho, Georgia, Florida, Pennsylvania, Arkansas, Alabama, Kentucky, Nebraska, Virginia, Texas, Mississippi and Michigan. Its corporate headquarters was located in Detroit, Michigan. In 1968, Guerdon employed approximately 2,900 persons, of whom 2,600 were engaged in manufacturing operations, 75 in sales (including 38

field representatives engaged in the solicitation of orders from dealers) and 225 in administrative duties. Its mobile homes were marketed through approximately 1,200 dealers located throughout the United States. Guerdon had a board of directors which held formal monthly meetings.

(b) Robert Meneely, the president of Guerdon between November 23, 1965 and October 6, 1967, joined the company in February 1964 as assistant to the president. He subsequently was appointed general manager of one of the divisions, a position he held until he became president. Meneely attended the University of Pittsburgh for several years, until he was hired by Alcoa in 1941 to work in production control. He served 10 years with Alcoa before he joined the Crane Company of New York City as the production control manager of a small plant. Meneely remained with the Crane Company for 10 years advancing to assistant to the president. For a year and a half thereafter, he served as the director of production and inventory control world-wide for Massey-Ferguson. Meneely was elected president of Guerdon to turn around the losses it experienced in the previous year. He accomplished this by reducing overhead and costs. Meneely eliminated excess personnel, and in one weekend, for example, he laid off 39 design and drafting employees. Although he did not directly supervise any one plant, Meneely devoted 60 percent of his time to observing the operations, inspecting the units, and teaching the employees better production techniques.

(c) Meneely worked approximately 80 to 100 hours a week, while the plant managers worked approximately 50 to 60 hours a week.

(d) Guerdon's prospectus, dated February 5, 1968, shows that Meneely received direct compensation of $46,654 for the fiscal year ended April 30, 1967. The chairman of the board of directors, F. L. Cappaert, received direct remuneration of $75,000 and $5,250 set aside for his benefit in the company's profit-shar-

ing retirement plan. Cappaert received these same amounts the following year when he served as president of Guerdon, according to a proxy statement dated August 5, 1968. While Cappaert was a principal shareholder, Meneely owned no stock in Guerdon.

(e) Guerdon is clearly not comparable to plaintiff.

25. (a) Redman Industries, Inc. was another multiplant mobile home manufacturer during the years in question. Its annual report for the year ended March 31, 1964 describes the company as having five plants and four officers. Its annual report for the year ended March 29, 1968 shows that it grew to nine plants and had six officers. These plants were located in Michigan, Georgia, Nebraska, Ohio, Pennsylvania, Oklahoma, California and Texas. The corporate headquarters was located in Dallas, Texas.

(b) James Redman, the president, began with the company in 1946. He worked first in the stockroom and then in sales, where he became a zone manager and later sales manager. In 1949, he was appointed general manager of the company, which was then a one-plant operation. James Redman testified for defendant and he stated that Redman Industries had grown to 22 or 23 plants by the time of trial, and although his title had changed to president and then to chairman of the board of directors, his duties of supervising the overall operations had remained the same.

(c) Other officers included a vice president of finance, responsible for maintaining internal accounting controls, preparing budgets, operating plans and the payroll; a vice president of materials, responsible for negotiating supply contracts, establishing inventory and cost controls and training the purchasing agents employed by the plants; a vice president of industrial relations, responsible for handling union matters; a vice president of sales; and a vice president of operations.

(d) The plant managers were responsible for the profit performance of their

plants and they had to operate within a predetermined budget for labor and other expenses. They were not, however, responsible for the designing, engineering, advertising, purchasing, bookkeeping, accounting or payroll functions.

(e) Redman Industries' officers received as compensation a base salary and a bonus which was based upon a percentage of pre-tax profits. James Redman received, at one time, as high as 10 percent of pre-tax profits, but, as the company's profits increased, his percentage decreased so that in 1966 or 1967 he received as a bonus 1.6 percent of pre-tax profits. Redman Industries also contributed to a retirement plan, but there is no evidence in the record showing how much was allotted to each officer. James Redman's testimony and proxy statements for the fiscal years 1965 through 1968 reveal the amount of compensation paid directly to James Redman and the next highest paid officers as follows:

| Fiscal year ending in March or April | James Redman | 2nd officer | 3rd officer |
|---|---|---|---|
| 1965 | $116,000 | $83,000 | $83,000 |
| 1966 | 97,170 | 67,037 | 67,037 |
| 1967 | 70,329 | 46,804 | 45,971 |
| 1968 | 76,000 | 60,167 | 48,000 |

Plant managers received a salary of $20,000 to $30,000 and a bonus based upon the plant's profits. The highest amount paid to a plant manager during the years in question was just over $50,000.

(f) Redman Industries is not a comparable company.

26. (a) Parkwood Homes, Inc. (hereinafter referred to as Parkwood) began operations in 1962 with only one plant which was located in Bristol, Indiana. Sometime in 1965 or 1966 Parkwood added a second plant in Moultrie, Georgia. In 1968, a third and fourth plant were added, one in Texas and the other in Middlebury, Indiana. Apparently, each plant had a manager.

The following table shows the number of mobile homes sold by Parkwood during the period in question:

| Year ended February 28 (29) | Number of mobile homes sold |
|---|---|
| 1965 | 2,079 |
| 1966 | 2,818 |
| 1967 | 2,914 |
| 1968 | 3,342 |

(b) Raymond F. Bassett, the president, went to the eighth grade of schooling. From 1958 to 1961, he was the president and major stockholder of Sabre Mobile Homes, a company that went into court receivership in 1961 and was eventually purchased by Skyline. Bassett thereafter served as a vice president of Skyline, until 1962, when he resigned to organize Parkwood. As president, he was responsible for all phases of production, for the design of the units and for the establishment of new plants. Parkwood attempted to introduce new models annually and at other times of the year to meet competition. Bassett reviewed all pricing completed by the cost accountants.

(c) Robert Gaume, a vice president, had served as the factory superintendent of Sabre Mobile Homes, he, too, was employed by Skyline, as a sales manager for one of Skyline's subsidiaries, until 1962, when he resigned to organize Parkwood. As a vice president, Gaume was primarily responsible for sales. He had a sales manager and one or two salesmen in each plant to assist him. Gaume also did whatever else was necessary to manage the company as there

were no formal rules delineating responsibilities.

(d) Clayton Merrill, the treasurer, joined Parkwood in 1964. He was responsible for keeping the financial records, paying the bills, handling the payroll and working with the credit manager. He participated in officer meetings and helped formulate company policies.

(e) B & J Woodcraft, Inc. (hereinafter referred to as B & J) manufactured furniture, counter tops, cabinets, doors and other furnishings and trim for mobile homes. Its one plant was located in Elkhart, Indiana and Parkwood was its primary customer. Although it was organized by Bassett before 1962, its sales to other customers declined so that in 1969, when it became a wholly-owned subsidiary of Parkwood, its sales to Parkwood were 96 percent of its output. During the years in question, Bassett served as B & J's president, Gaume served as its vice president and Merrill served as its treasurer. Raymond Bassett testified that B & J employed a plant manager, but he did not explain the duties and amount of time spent by the officers in fulfilling their responsibilities. Prior to its sale to Parkwood, Bassett and Gaume owned all of B & J's stock, each possessing 50 percent.

(f) The compensation paid directly to the officers, whose duties have been described, for the 3 years for which there is evidence is as follows:

| Officer | Year ended Feb. 28, 1966 | Year ended Feb. 28, 1967 | Year ended Feb. 28, 1968 |
|---|---|---|---|
| Raymond Bassett | | | |
| Parkwood | $40,000.00 | $56,454.66 | $55,000.00 |
| B & J | 27,845.00 | 40,000.00 | 40,000.00 |
| Total | 67,845.00 | 96,454.66 | 95,000.00 |
| Robert Gaume | | | |
| Parkwood | 40,000.00 | 56,454.66 | 55,000.00 |
| B & J | 27,845.00 | 40,000.00 | 40,000.00 |
| Total | 67,845.00 | 96,454.66 | 95,000.00 |
| Clayton Merrill | | | |
| Parkwood | 15,850.00 | 16,780.00 | 23,000.00 |
| B & J | 2,100.00 | 2,650.00 | 2,600.00 |
| Total | 17,950.00 | 19,430.00 | 25,600.00 |

In addition, both Parkwood and B & J maintained profit-sharing and retirement plans to which they contributed during at least some of the years in question. Parkwood carried life insurance on its officers, who could designate their own beneficiary, at an average cost of $8,000 a year for the premiums. Parkwood also owned one or two airplanes, several automobiles furnished to Bassett and Gaume, and a yacht used to entertain dealers. Sales managers received a salary between $15,000 and $22,000 a year. A purchasing agent received between $200 and $225 a week at first, and more if he stayed with the company.

(g) Parkwood is not a comparable company.

27. Defendant requested findings concerning compensation paid to officers of other mobile home manufacturers, namely, Lonergan Corporation, Fleetwood, Divco-Wayne, Champion, Town and Country, Princess-Zimmer, Commodore, Monarch and Conner. There is no evidence in the record as to the duties and responsibilities of the individual officers or to the operations of the companies. It is therefore concluded that such compensation, standing alone for the individual officer, cannot be used as a measure of the reasonableness of the amounts paid to plaintiff's officers.

28. (a) Robert F. Klumpp, a certified public accountant, graduated from the University of Michigan School of Business in 1949. He was employed by Arthur Anderson & Company, a national accounting firm, in 1950, and he served in the Detroit office as a member of the audit staff and later as audit manager. In 1961, Klumpp became a partner, and he continued with Arthur Anderson & Company until the end of 1970 when he resigned to join Boise Cascade as director of financial control.

(b) Arthur Anderson & Company had substantial clients in the mobile home industry, including Commodore, Fleetwood, Guerdon and Travello. As a partner, Klumpp had firm wide responsibility for the construction materials industry which included the mobile home industry. He supervised the audit of Guerdon from 1961 to 1967 and Travello from 1967 to 1969. Boise Cascade was also connected with the mobile home industry, having acquired Divco-Wayne in 1966.

(c) Klumpp was informed by plaintiff's counsel that the principal question in issue concerned the reasonableness of compensation paid to plaintiff's officers. He was requested to compile statistics on the operating and financial ratios of mobile home manufacturers and to the extent available, compensation ratios. Klumpp found that such data for the industry was limited, particularly with respect to small and medium-sized companies. Market studies of officer compensation published in dealer magazines were helpful, but inadequate, because the studies contained summary information without revealing the scope of the survey, i. e., the method of compilation, the names and size of the manufacturers included and the extent of the available data utilized. Klumpp resorted to documents that were public information on file with the Securities and Exchange Commission, Washington, D.C

(d) Klumpp secured copies of all prospectuses, proxy statements, annual reports, 10–K forms and other relevant documents pertaining to mobile home manufacturers registered with the Securities and Exchange Commission. From information contained in these documents, he prepared a survey of those manufacturers who, like plaintiff, were producing predominently mobile homes (rather than travel trailers) between 1964 and 1967. Klumpp's survey consisted of 15 manufacturers in the years 1964 and 1965 and 14 of the same manufacturers in the years 1966 and 1967. Not all mobile home manufacturers were registered with the Securities and Exchange Commission. The Automotive Credit Service lists 295 such manufacturers, producing predominantly mobile homes, in the year 1968. Klumpp considered his group as representative of the industry since its sales amounted to 39 percent in 1966 and 48 percent in 1967 of the total sales in the United States. Klumpp also extracted data on nine of these manufacturers whose sales were less than $20,000,000 each in 1964. He considered this group to be comparable to plaintiff as the giants of the industry were excluded. Klumpp's survey contained data on, *inter alia*, net sales, officers' compensation, pre-tax income, after-tax income, cash dividends paid and beginning of the year stockholders' investment. The data on officers' compensation was not available for each of the manufacturers.

(e) Defendant furnished Klumpp with the corporate tax returns of Skyline and Redman, who were included in the group of 15 manufacturers representative of the industry, and the returns of Parkwood and Lonergan, who were included in the group of nine manufacturers considered comparable to plaintiff. These tax returns provided Klumpp with additional data on officers' compensation and on compensation paid to sales and administrative personnel, which was not available in the Securities and Exchange Commission files.

(f) Klumpp testified that six of the most important ratios for plaintiff's purposes are:

(1) Pre-tax income as a percent of net sales;

582

(2) After-tax net income as a percent of beginning stockholders' investment;

(3) Dividends as a percent of beginning stockholders' investment;

(4) Total officers, sales and administrative compensation as a percent of pre-tax income;

(5) Total officers, sales and administrative compensation as a percent of net sales;

(6) Officers' compensation as a percent of total officers and administrative compensation.

He did not undertake to compare the functions or duties of the officers or ascertain the number of officers in any of the companies. Klumpp was of the opinion that a commission based upon sales was an acceptable, but somewhat unsophisticated, manner of compensating officers in the mobile home industry. He considered the compensation paid to plaintiff's officers to be reasonable.

29. Documents on file with the Securities and Exchange Commission did reveal a formula by which one company compensated its officers in 1967. Princess-Zimmer paid its chief executive a bonus equal to 10 percent of net income before taxes or bonus. The other officers received bonuses totaling 12.8 percent of net income before taxes or bonuses. If such a plan were used by plaintiff, its officers would have received more compensation in 1967 than they did. No evidence was presented on the duties and responsibilities of Princess-Zimmer's officers or on the size and nature of Princess-Zimmer's operations. This plan of compensation, thus, cannot be used as a measure of the reasonableness of the amounts paid to plaintiff's officers.

30. (a The survey prepared by Robert Klumpp shows the average annual pre-tax income as a percentage of net sales for the years in issue as follows:

Group of manufacturers representative of the industry .............................. 4.4%
Group of manufacturers comparable to plaintiff ................................. 5.3%
Plaintiff ................................. 8.05%

(b) The survey shows the average annual after-tax net income as a percentage of beginning stockholders' investment (return on invested capital) for the years in issue as follows:

Group of manufacturers representative of the industry ............................. 20.6%
Group of manufacturers comparable to plaintiff ................................. 39.3%
Plaintiff ............................. 72.1%

(c) This survey shows the average annual cash dividend as a percentage of beginning stockholders' investment for the years in issue as follows:

Group of manufacturers representative of the industry ............................. 5.23%
Group of manufacturers comparable to plaintiff ................................. 4.25%
Plaintiff ............................. 6.85%
(plaintiff's dividends were paid to only one stockholder as described in finding 8)

(d) The corporate tax returns furnished Klumpp show the average annual total officers, sales and administrative personnel compensation as a percentage of pre-tax, pre-compensation income for the years in issue as follows:

Redman ------------------------- 52.03%
Lonergan ------------------------ 49.59%
Parkwood ------------------------ 45.00%
Skyline ------------------------- 36.49%
Plaintiff ------------------------ 33.14%

These percentages reflect only direct compensation, and not deferred remuneration (such as amounts set aside for profit-sharing or retirement plans) or life insurance or other benefits. In the case of Parkwood, the percentage does not reflect amounts paid to the officers by B & J Woodcraft, Inc.

31. (a) The Mobile Home/Travel Trailer Dealer Magazine, officed in Chicago, Illinois, published a survey of, inter alia, salaries received by employees of companies who manufacture mobile homes. Survey forms were sent to 175 companies and replies were received from 46 "plants". Individual plant reports were requested rather than combined statements from the multiple plant manufacturers. The survey took place between May and June, 1968. Forty-

five of the replies were from "companies" with dollar sales volumes under $15,000,000. Salary ranges and average salaries were received for the owner-manager, general manager, purchasing agent, sales manager, phone salesman, foreman, production manager, engineer, assistant purchasing agent, assistant sales manager, road salesman, designer and accountant. The salary of the owner-manager was reported by only 18 companies. The salary of the general manager was reported by 23 companies.

(b) The survey does not reveal the name, size, profitability, or basis for selection of any of the manufacturers. The duties and responsibilities of the employees are not explained. Its use of the term "company" and "plants" interchangeably makes it impossible to determine at what level the employees were working. Other forms of compensation, besides the salary, are not disclosed. The survey cannot be used to measure the reasonableness of the compensation paid to plaintiff's officers.

32. Plaintiff produced expert witnesses who testified that the compensation paid to plaintiff's officers was reasonable. Two of the witnesses look upon after-tax income as a percentage of beginning stockholders' investment to determine if a company is well managed. None of these witnesses had ever visited plaintiff's operation or observed plaintiff's officers performing their duties and responsibilities. They did not testify to or compare the duties of officers of other manufacturers comparable to plaintiff, nor did they testify to the compensation paid by other manufacturers. It is obvious that their conclusion that the compensation was reasonable was from an investment viewpoint based upon the profitability of plaintiff's operations.

### CONCLUSION OF LAW

Based upon the foregoing findings of fact, conclusions of law and opinion, which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that in computing its taxable income for each of the years 1964–1967, plaintiff is entitled to deductions, as reasonable allowances for salaries and other compensation paid for personal services actually rendered, in the sum of $75,000 per year for its president, R. O. Giles, $37,500 per year for its vice president, Ray Neely, and $25,000 for 1964 and $37,500 for each of the years 1965–1967 for its treasurer, James Giles. Entry of judgment is deferred until the amounts of recovery on plaintiff's petitions and defendant's counterclaims have been determined in further proceedings pursuant to Rule 131, to permit offsetting of the amounts of recovery to arrive at a net judgment in favor of the party entitled to recover the larger sum.