GILES INDUSTRIES, INC.

v.

The UNITED STATES.

No. 287–75.

United States Court of Claims.

May 20, 1981.

Charles F. Wood, Louisville, Ky., attorney of record, for plaintiff.

Marc Levey, Washington, D. C., with whom was Acting Asst. Atty. Gen. John F. Murray, Washington, D. C., for defendant; Theodore D. Peyser and Donald H. Olson, Washington, D. C., of counsel.

Before FRIEDMAN, Chief Judge, and KUNZIG and BENNETT, Judges.

## OPINION

PER CURIAM:

This case comes before the court on plaintiff's motion, filed March 25, 1981, moving that judgment be entered on the recommended decision of Trial Judge Judith Ann Yannello, filed February 4, 1981, pursuant to Rule 134(h), plaintiff having filed no exceptions thereto and defendant having on March 18, 1981 withdrawn its previously filed notice of intention to except thereto. Upon consideration thereof, without oral argument, since the court agrees with the recommended decision as hereinafter set forth,* it hereby affirms and adopts the decision as the basis for its judgment in this case. Accordingly, plaintiff's motion for judgment is granted and judgment is entered for plaintiff as provided in the trial judge's opinion with the amount of recovery to be determined pursuant to Rule 131(c).

## OPINION OF TRIAL JUDGE

YANNELLO, *Trial Judge:* Giles Industries, Inc., a Tennessee corporation organized in 1959, seeks a refund for the alleged overpayment of corporate income tax in the calendar years 1968 through 1973. In each of these years, a tax return was filed timely and tax was paid as computed on each return.

### I. *Introduction*

The Commissioner of Internal Revenue assessed a deficiency for every year in the 1968 through 1973 period, disallowing a por-

---

* Although the court adopted the trial judge's separate findings of fact, which are set forth in her report, they are not printed herein since such facts as are necessary to the decision are contained in her opinion.

tion of certain deductions taken for executive compensation. In disallowing these amounts, the Commissioner asserted that compensation paid to three Giles' officers was excessive, being well beyond the reasonable value of their services. Plaintiff paid these deficiencies and brought suit in the Court of Claims to recover these payments.

The three officers of concern in this case are R. O. Giles (president), Ray Neely (vice president) and James Giles (treasurer). Together, they constitute not only the key officers and decision-makers of Giles Industries, Inc., but also the entire management or supervisory staff. In addition to managing the corporation, these individuals are also the primary stockholders of Giles Industries, Inc., with ownership vested primarily in the hands of R. O. Giles, founder of the company, who held 840 of the 1100 shares issued and outstanding. The remaining 260 shares were held by Ray Neely (70 shares), James Giles (70 shares), Dorothy Neely (60 shares) and Maxine Giles (60 shares).

Throughout the period in question, Giles Industries, Inc., engaged in the manufacture and wholesale distribution of mobile homes, recreational vehicles (RV's) and modular offices. All manufacturing and sales activity took place at that company's sole plant in Middlesboro, Kentucky.

In addition, in 1969, another corporate entity, Giles of Tazewell, was created, which was engaged in the same type of activity as was Giles Industries, Inc. While not a subsidiary of Giles Industries, Inc., Giles of Tazewell (hereinafter, "Tazewell") was created and owned by the three principal officer-shareholders of Giles Industries, Inc. In contrast to its sister corporation, Tazewell had no controlling majority shareholder and ownership was divided into three minority interests, with James Giles and Ray Neely each holding 37.5 percent and R. O. Giles possessing 25 percent.

Furthermore, Tazewell had no offices of its own during the period in question. Under an arrangement, which R. O. Giles characterized as a "management agreement," Tazewell was managed through the offices of Giles Industries, Inc. The officers of Giles Industries, Inc., provided Tazewell with managerial, marketing, bookkeeping, purchasing, supervisory and other services, in return for a "management fee," which was paid to Giles Industries, Inc. This fee was based on a percentage of Tazewell's gross sales and, during the years in question, it varied between 10 and 12 percent. Not only did the management fee cover managerial services rendered, but it also reimbursed Giles Industries, Inc., for inventory purchases made on Tazewell's behalf.

In effect, the two corporations were run as one, with the officers serving in identical capacities in each. R. O. Giles, president of the companies, testified that it was often not possible to determine whether a specific service was being rendered for one corporation or the other, and certain tasks, such as inventory purchases, were performed on behalf of both corporations in a single transaction. This lack of discrete operation only compounds the task of the court. Nonetheless, Giles Industries, Inc., and Tazewell are separate taxpayers and the issues raised by the deficiency assessments noted herein concern only taxpayer Giles Industries, Inc.[1]

## II. *Comparison With Prior Litigation*

The reasonableness of the officers' salaries paid by Giles Industries, Inc., for the years 1964 through 1967, was determined by this court in *Giles Industries v. United States*, 204 Ct.Cl. 202, 496 F.2d 556 (1974), hereinafter referred to as "*Giles I*". For the years there in issue, there was no corporate entity known as Tazewell, but otherwise the corporate structure of taxpayer, Giles Industries, was essentially the same in

---

1. The officers' compensation at issue here consists of salaries and bonuses paid by Giles on its own behalf and of bonuses paid by Giles on behalf of Tazewell (and recovered by Giles from Tazewell as part of the "management fee" discussed in the text above.) The amounts in

issue here do not include the salaries paid directly to the officers by Tazewell on its own behalf in the years 1968 and 1969. (Such direct salary payments by Tazewell were nominal in 1970.)

1964–67 as it was for the years now in issue, as was the system of compensation of officers.

The statistical data reported by the court in *Giles I, supra,* for the years 1964 through 1967, together with the data found herein, can be set forth as follows:

*($ IN THOUSANDS)*

| | 1964 | 1965 | 1966 | 1967 | 4-Yr Avg. 1964–67 | 1968 | 1969 | 1970 | 1971 | 1972 | 1973 | 6-Yr Avg. 1968–73 | % Incr. in Avg. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Net Sales:** | | | | | | | | | | | | | |
| Giles | 6,777 | 6,734 | 6,159 | 5,630 | 6,325 | 5,423 | 6,314 | 5,705 | 5,793 | 6,217 | 6,423 | 5,979 | |
| Tazewell | N.A. | N.A. | N.A. | N.A. | N.A. | N.A. | 1,309 | 1,628 | 1,797 | 2,855 | 4,464 | 2,009 | |
| Total | 6,777 | 6,734 | 6,159 | 5,630 | 6,325 | 5,423 | 7,623 | 7,333 | 7,590 | 9,072 | 10,887 | 7,988 | 26.3 |
| **Pretax Income:\*** | | | | | | | | | | | | | |
| Giles | 338 | 533 | 377 | 981 | 557 | 311 | 718 | 751 | 440 | 467 | 215 | 484 | |
| Tazewell | N.A. | N.A. | N.A. | N.A. | N.A. | N.A. | 166 | 184 | 223 | 447 | 718 | 290 | |
| Total | 338 | 533 | 377 | 981 | 557 | 311 | 884 | 935 | 663 | 914 | 1,433 | 857 | 53.8 |
| **Officers Comp.\*\*** | | | | | | | | | | | | | |
| R. O. Giles | 75 | 75 | 75 | 75 | 75 | 82 | 102 | 103 | 127 | 136 | 151 | 117 | |
| James Giles | 25 | 37.5 | 37.5 | 37.5 | 34.4 | 42 | 53 | 56 | 68 | 73 | 83 | 62.5 | |
| Ray Neely | 37.5 | 37.5 | 37.5 | 37.5 | 37.5 | 42 | 53 | 56 | 68 | 73 | 82 | 62.3 | |
| Total | 137.5 | 150 | 150 | 150 | 146.9 | 166 | 208 | 215 | 263 | 282 | 316 | 241.8 | 64.6 |
| **Salaries as % of Sales** | 2.0% | 2.2% | 2.4% | 2.7% | 2.3% | 3.1% | 2.7% | 2.9% | 3.5% | 3.1% | 2.9% | 3.0% | |
| **Salaries as % of Pretax Income** | 40.7% | 28.1% | 39.8% | 15.3% | 26.4% | 55.0% | 24.2% | 23.6% | 40.5% | 31.7% | 34.3% | 32.0% | |

NOTES TO CHART:

\* The pretax income shown for 1964–67 has been adjusted so as to reflect the income which would have resulted had only those salaries found reasonable by the court been paid. For example, in 1964, reported pretax income (resulting after actual payment of salaries) was $321,000. The salaries paid were as follows:

| | Paid | Allowed by Court | Difference | |
|---|---|---|---|---|
| R. O. Giles | $78,265 | $75,000 | $3,265) | |
| Ray Neely | $38,871 | $37,500 | $1,371) | ≈ $16,707 |
| James Giles | $37,071 | $25,000 | $12,071) | |

Hence, adjusted pretax income is shown as $337,707 (rounded to $338,000) or $321,000 + $16,707.

\*\* The amounts reflected for the years 1964 through 1967 represent those found by the court in *Giles I, supra,* to have been reasonable; the amounts for 1968 through 1973 represent the amounts actually paid by Giles Industries, Inc., the reasonableness of which is in issue herein.

The average annual sales and pretax income of Giles and Tazewell, combined, for the period 1968 through 1973, exceeded the level for Giles, alone, during 1964 through 1967. For the period 1964 to 1967, average pretax income represented 8.8 percent of sales and for 1968 to 1973 [2], average pretax income represented 10.7 percent of sales. In short, the same officers (*i. e.,* managerial staff) generated more sales (and a proportionately greater pretax income) during the years now in issue than in the immediately preceding years, on an average.

2. It is recognized that some increase in the dollar amounts of sales and pretax income, may have resulted from unusual inflationary

In addition to the foregoing statistical data, comparisons of the duties and functions of the officers in the 1964–67 period and the 1968–73 period are appropriate. A description of the earlier period is adequately set forth in *Giles I, id.* at 207, 496 F.2d at 559.

For the instant period, 1968–73, the following discussion pertains:

A. *R. O. Giles.* In the years in issue, 1968–73, R. O. Giles did not participate in extensive purchasing activities (other

spirals from 1968 to 1973, rather than from an increase in real unit output.

than of rough lumber) or extensive hiring or supervising of production personnel. R. O. Giles took no direct active part in advertising or account-collection activities, and took little direct part in designing or dispatching of products. He did, however, function essentially as the chief executive of the company, with recognition of his role in prior years as "the real head of the company," (204 Ct.Cl. at 207, 496 F.2d 556), and exercised general review and oversight functions. As chief executive, R. O. Giles approved all design changes submitted by other personnel; reviewed all plant operations; approved proposed loans; gave final approval in union negotiations; made final decisions on pricing proposals; approved purchases of major items; reviewed tax and insurance matters and approved settlements in insurance and other legal matters; set company salaries; and provided advice on plant safety. R. O. Giles' review of business matters was not merely perfunctory and he might both reject proposals submitted to him or initiate new proposals when appropriate.

B. *Ray Neely.* Ray Neely, the son-in-law of R. O. Giles, served during the years in issue as vice president and general manager, and his primary responsibility was to manage Giles Industries' sales activities. Mr. Neely was responsible for facilitating financing for the retail dealers or sellers of Giles' products. The company's limited sales force reported directly to Mr. Neely, who was ultimately responsible for delivery of Giles' products, including obtaining necessary shipment permits, processing sales invoices and verifying of dealer credit ratings. Incidental to his sales responsibility, Mr. Neely prepared design layouts for Giles' limited descriptive advertising brochures and attended the company's mobile home shows. Finally, Mr. Neely was responsible for product design, including variations within existing models, as well as generation of completely new designs and adaptation of existing models to customer-furnished specification. In related activities, Mr. Neely oversaw product quality control, product servicing, collection of accounts receivable, determining dealer discounts, and obtaining FHA approval on production units.

During the years in issue, Mr. Neely assumed many of the duties previously exercised directly by R. O. Giles, subject to the continued general oversight by R. O. Giles.

C. *James Giles.* James Giles, son of R. O. Giles, served as company treasurer and purchasing agent. James Giles purchased all of the company's inventory items (except the rough lumber, which was purchased directly by R. O. Giles) and maintained inventory control of such items, so as to assure an adequate supply and provide cost data to sales personnel for pricing purposes.

In addition to his duties as purchasing agent, James Giles also performed a number of unrelated tasks, including the following: Assisting Ray Neely with Giles' insurance program and in Giles' sales department, and resolving OSHA-related matters.

In brief, it may be noted that, as compared with the earlier period 1964–67 previously examined by the court, R. O. Giles' active duties declined and he assumed, during the years now in issue, a role more in the nature of senior executive and adviser. Conversely, the active duties of Messrs. Ray Neely and James Giles increased in the years now in issue, as compared with prior years.

The salaries actually paid to the three officers from 1968 to 1973 exceeded those found by the court to have been reasonable in the immediately preceding years. The salaries remaining after disallowances by the IRS and now urged here by the defendant, would, in essence, equal those found by the court to have been reasonable for the immediately preceding years, with little or no increase by virtue of increases in sales, net income, or cost-of-living, or of any increases in duties performed.

### III. *Industry Comparisons*

As was done in *Giles I, supra,* the parties here also introduced evidence concerning officers' compensation in other mobile home

companies.[3] However, the personnel structure of these companies differed markedly from that of Giles. Whereas Giles operated with essentially three executive officers, the other companies employed either several additional executive officers or a few such officers assisted by several additional supervisory or quasi-executive managers in various plants or offices. Giles' three officers, therefore, individually assumed more duties and responsibilities than did many of their counterparts in other companies and their aggregate salaries may reflect this. Hence, any comparisons with the compensation paid by other companies provides little guidance here.

### IV. *Discussion*

A determination of reasonable officers' compensation in the instant case may appropriately follow from the court's prior determination of reasonable salaries in the immediately preceding years. As noted, company structure, business, and method of compensating officers was relatively unchanged between the years now in issue and those previously studied by the court.

Although such comparisons are, therefore, not conclusive, they may supply some helpful yardsticks. For example, the average officer compensation paid by other companies represented between 1 and 1.3 percent of the sales of such companies. In *Giles I*, the court determined reasonable compensation levels which—though not necessarily determined in this fashion—amounted to about 2.3 percent of sales. The reasonable salaries for Giles' officers may properly exceed that paid by other companies in view of the differences in corporate structure as noted above. Salaries paid during the years in issue, however, amounted to approximately 3 percent of sales, on an average, which is considerably more than was paid by other companies, and more than was found to be reasonable by the court for prior years.

It must be noted that the level of salaries found by the court to be reasonable in prior years must be adjusted somewhat in the years now in issue so as to take into account the increases in the cost of living during this period. This concern was mentioned in the course of trial proceedings, but no evidentiary material was produced. Nonetheless, the court can take judicial notice of public information concerning the cost of living variations, such as the statistics compiled by the United States Department of Commerce, and its Census Bureau and Bureau of Labor Statistics. For example, the *Statistical Abstract of the United States for 1975*, at page 422, *et seq.*, sets forth the Consumer Price Indexes, for all items, for 1950 to 1975, as follows (with the year 1967—the last year in the period previously reviewed by the court in *Giles I, supra,*—as par):

| All Items: | |
|---|---|
| 1967: | 100.0 |
| 1968: | 104.2 |
| 1969: | 109.8 |
| 1970: | 116.3 |
| 1971: | 121.3 |
| 1972: | 125.3 |
| 1973: | 133.1 |

Similar information, stated differently, appears at page 416, setting forth the Percent Change Per Year in Selected Price Indexes as follows, for the years in issue:[4]

| All Items: | |
|---|---|
| 1968: | 4.7 |
| 1969: | 6.1 |
| 1970: | 5.5 |
| 1971: | 3.4 |
| 1972: | 3.4 |
| 1973: | 8.8 |

As noted above, the court can take notice of these statistics, at least for the purpose of establishing general statistical guidelines.

The government, in its brief at pages 5 and 6, contends that compensation for inflation is inherent in the fact that the officers receive not only a fixed salary, but also a commission which is computed on sales and the sales prices themselves would take in-

---

3. This evidence is summarized in the trial judge's findings of facts and is not restated herein for the reasons noted in subsequent portions of this opinion.

4. In the 4 immediately preceding years, the percent change was in the range of from 1 to 3 percent per year.

flation into account. This may, in actual practice, have, indeed, been the case and it is noted that the officers' salaries steadily increased during the period in issue. However, the actual salaries paid are now under review and, in determining what amounts are reasonable, the court must preserve some consideration for inflation during this 6-year period.

Consequently, it is to be expected that the officers' salaries would increase during the years in issue, as compared with the immediately preceding period already reviewed by this court, so as to reflect increases in the cost of living, just as the level of sales increased (by an average of 26 percent) over the sales of the preceding period.

Similarly, it must be recognized that the duties of the officers changed during the years in issue. R. O. Giles, for example, performed fewer active duties and became more of a senior executive. James Giles and Ray Neely, on the other hand, performed more active duties, replacing, in part, R. O. Giles, and assumed greater responsibilities. Hence, it is to be expected that the salaries of James Giles and Ray Neely would increase for this reason. The salary of R. O. Giles may be expected to decrease somewhat, by reason of his less active status, while, at the same time, recognizing the value of experience of a senior executive and the inflationary increases discussed above.

For example, considering all of the foregoing, it may be said that if the salary for R. O. Giles were maintained at $75,000 per annum for 1968 to 1973, with no increases for cost of living adjustments then, in effect, it is recognized that the decline in his duties coincided, approximately, with such increases in costs of living—approximating 5 percent per year. If the salaries of Ray Neely and James Giles were increased to compensate for increases in costs of living alone, such adjusted salaries might approximate the following:

| 1968: | $39,000 |
| 1969: | 41,500 |
| 1970: | 44,000 |
| 1971: | 45,000 |
| 1972: | 47,000 |
| 1973: | 51,000 |

It has also been noted, however, that the duties of Ray Neely and James Giles increased, particularly as they assumed the more active duties previously and traditionally performed by R. O. Giles. The salaries set forth herein might then be adjusted further:[5]

| 1968: | $40,000 |
| 1969: | 43,000 |
| 1970: | 46,000 |
| 1971: | 47,000 |
| 1972: | 50,000 |
| 1973: | 54,500 |

Based on all of the foregoing, therefore, it is concluded that the following salary amounts reflect reasonable compensation for the three officers for the period in issue:

| | R. O. Giles: | Ray Neely: | James Giles: |
|---|---|---|---|
| 1968 | $ 75,000 | $ 40,000 | $ 40,000 |
| 1969 | 75,000 | 43,000 | 43,000 |
| 1970 | 75,000 | 46,000 | 46,000 |
| 1971 | 75,000 | 47,500 | 47,500 |
| 1972 | 75,000 | 50,000 | 50,000 |
| 1973 | 75,000 | 54,500 | 54,500 |
| Total: | $450,000 | $281,000 | $281,000 |

The total aggregate salary compensation found to be reasonable is $1,012,000, which represents, on an average annual basis, approximately 2.1 percent of average annual net sales. The average annual aggregate salaries of $168,666 ($1,012,000 ÷ 6), represents an increase of less than 15 percent over the average annual aggregate salaries allowed for the prior 4-year period (i. e., $146,900), whereas, net sales, on an average annual basis, increased about 26 percent and net income increased over 50 percent.[6]

## CONCLUSION OF LAW

Based on the foregoing, the court concludes as a matter of law that in computing

---

5. For the years now in issue, both plaintiff, in actual payment of salaries, and the government, in its assessments of deficiencies, maintained Ray Neely and James Giles at equivalent salaries, as had the court in reviewing 3 of the 4 immediately preceding years.

6. As noted, the salary of R. O. Giles has not increased at all; the salaries of Ray Neely and

its taxable income for each of the years 1968 to 1973, plaintiff is entitled to deductions, as reasonable allowances for salaries and other compensation paid for personal services actually rendered by R. O. Giles, Ray Neely and James Giles, the sum of $155,000 for 1968; $161,000 for 1969; $167,000 for 1970; $170,000 for 1971; $175,000 for 1972; and $184,000 for 1973, as individually computed above.

Entry of judgment is deferred until the amounts of recovery on plaintiff's petition have been determined in further proceedings pursuant to Rule 131.

James Giles have increased approximately 25 percent, on an annual average basis, over the salaries found reasonable in the prior period. As stated in the text, the constancy of R. O. Giles' salary reflects both an increase in the cost of living and a decrease in his active duties; the increases in the salaries of Ray Neely and James Giles reflect increases in both the cost of living and the increased duties and responsibilities assumed in view of the decline in active participation of R. O. Giles.