DIVERSE INDUSTRIES, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Diverse Industries, Inc. v. Commissioner
Docket No. 3037-81.
United States Tax Court
T.C. Memo 1986-84; 1986 Tax Ct. Memo LEXIS 528; 51 T.C.M. (CCH) 525; T.C.M. (RIA) 86084; March 3, 1986. Lon M. Mickelson and Gerald I. Neiter, for the petitioners. Marc J. Winter, for the respondent. GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION GERBER, Judge: Respondent determined a deficiency of $52,761 in Federal income tax for petitioner's taxable year ended January 31, 1977. The sole issue for consideration is the amount that petitioner is entitled to deduct for that year as reasonable compensation to its president. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioner is a California corporation that had its *529 principal place of business in Van Nuys, California, at the time it filed the petition in this case. For its taxable year ended January 31, 1977, petitioner timely filed a United States corporate income tax return with the Internal Revenue Service Center in Fresno, California. Some time prior to 1973, Richard James (James) and Horace Kline (Kline) operated a modeling agency. While operating their agency, James and Kline became interested in marketing sexually oriented material by mail and began a mail-order business. Their mail-order company successfully advertised in men's magazines and grew in size, and ultimately the partners decided to abandon the modeling agency and concentrate their efforts on mail-order sales. On January 23, 1973, the business, now known as Diverse Industries, Inc., was incorporated. James became president and Kline vice-president and secretary. On March 15, 1973, pursuant to a written agreement, Kline resigned as an officer of petitioner, and petitioner redeemed his 50-percent interest in the business. The agreement provided that petitioner, which had theretofore not issued any stock, would issue stock to James, who owned the other 50 percent of the *530 interests of the corporation. Petitioner then issued 100 shares no-par value common stock to James. Petitioner During James' Presidency
James acted as petitioner's president and sole shareholder until February 28, 1976, when he sold the business. He prided himself on running petitioner differently than most adult mail order companies, which he regarded as essentially one-man operations. To improve petitioner's efficiency, he developed a management team, consisting of Robert Easley, Gary Wolfe and Burt Goldman, to oversee and work with him on various aspects of the business. Each of these men was a long-time employee and initially was hired for an entry-level position in petitioner's organization. None held a college degree. Easley did not have a high school diploma. Wolfe had completed two years of college and some classes in the field of graphic arts. Prior to his employment with petitioner, Wolfe had worked as a fry cook in a hamburger restaurant. Goldman's educational background consisted of one year of college classes in the field of business administration. Easley, Wolfe and Goldman nevertheless impressed James with their abilities, and assumed more and more *531 responsibilities within the organization. Eventually, Easley became marketing director, Wolfe art director and Goldman financial officer. James directed a business that sold sexually oriented movies, magazines, devices and other items. Marketing these provocative materials involved carefully identifying potential customers. Petitioner used special mailing lists for this purpose. Petitioner had two kinds of mailing lists: an in-house list, composed of the names of people who had responded to petitioner's ads in such publications as Playboy and Penthouse; and rental lists, composed of the names of people who had purchased from other companies items similar to those sold by petitioner. Before purchasing a rental list, petitioner would test it by sending brochures or catalogs to small random sample of names on the list. If the results of a test mailing were positive, petitioner would purchase more names from the list. In addition to lists, petitioner tested the effectiveness and best use of individual brochures. Continual attempts were made to improve the quality of mailings. During James' presidency, petitioner issued its first full-color brochure. *532 Unlike most mail order companies, the conduct of petitioner's business was affected by stringent legal prohibitions on the distribution of its merchandise. In Miller v. California,413 U.S. 15 (1973), the Supreme Court held that obscenity is determined by applying contemporary community standards, not national standards. In the same year as the Miller decision, James and petitioner were tried and acquitted in Austin, Texas, on obscenity charges. James took a number of measures to avoid further obscenity prosecutions. He retained a lawyer with expertise in First Amendment cases and subscribed to publications dealing with censorship. Petitioner was required to purchase a post office list of names of persons who objected to receiving sexually oriented mail. James was careful not to send sexually oriented material to these persons. Additionally, James sent no mailings to certain geographical parts of the country. He made certain that order forms were correct and complete. In a further effort to avoid prosecutions under Miller, James hired Ron Raffaelli, a photographer whose work he admired, to produce products with "artistic merit." Despite the precautions *533 taken by James, on June 17, 1975, he and petitioner were indicted in the United States District Court for the Western District of Louisiana, charged with using the mails to send obscene literature illustrating films, books, magazines and devices, and other offenses. [1] On October 6, 1975, petitioner through James entered a plea of guilty to one count of the indictment, and James entered a plea of guilty to another count. On December 30, 1975, the court imposed the following sentence: (1) Petitioner was ordered to pay a $5,000 fine; (2) James was ordered to pay a $5,000 fine; (3) James was placed on a five-year probation with a special condition that he divest himself of all interest in petitioner within 60 days. *534 Compelled to sell petitioner within a 60-day period, James was intent upon receiving as much cash "up-front" as possible. No one outside of the company came forward with a reasonable offer. Running out of time and prospects, James considered offering petitioner to an employee of the company. He knew that no one in the company had the up-front money he desired, but liked the idea of transferring petitioner to someone he trusted and who had the knowledge necessary to run to company. James first contacted Easley. Easley had been with petitioner longest in terms of service, and James had worked closely with him. Because of the lingering threat of prosecution, Easley was not interested in owning petitioner's stock under his own name. James then offered to sell petitioner's stock to Goldman. Like Easley, Goldman, who had a family, was not willing to take the risk of owning petitioner. James then contacted Wolfe. As petitioner's art director, Wolfe was responsible for creating petitioner's brochures, catalogs, graphic design and, in collaboration with James, petitioner's written copy. Wolfe was interested in buying James' stock in petitioner. Although Goldman and Easley were *535 unwilling to be shareholders of record in petitioner, they were nevertheless interested in remaining with petitioner and having a financial stake in the corporation.On February 1, 1976, Wolfe, Goldman and Easley signed a document entitled "Co-Ownership Agreement" for the purpose of forming an investment partnership to acquire ownership of petitioner. The agreement provided that the partnership would acquire all of the outstanding shares of petitioner from James in the name of Wolfe, as nominee. It stated that Wolfe, Goldman and Easley, as co-owners of the partnership, would own the following respective percentage interests in the partnership and its asset, the shares of petitioner: 30 percent, 30 percent and 40 percent. The agreement recited that James, as a condition to the sale of his shares, required that Easley and Goldman remain employees of petitioner until March 31, 1979; it stated that Easley and Goldman agreed to accept employment with petitioner through that date. The agreement specified that Easley and Goldman were joint and several guarantors of a promissory note to be executed February 28, 1976, by Wolfe in favor of James to the extent of two percent of the unpaid *536 principal balance. The agreement further provided that Wolfe would be managing co-owner with control over the shares and business operations of petitioner. Wolfe was not required to consult or confer with his other co-owners in making business decisions. The agreement authorized Wolfe to negotiate with James and acquire all outstanding shares of petitioner in Wolfe's own name for the partnership as beneficial owner. On the evening of February 28, 1976, Wolfe and James executed documents entitled "Purchase and Sale of Stock," "Promissory Note" and "Escrow Agreement." Under the terms of the stock purchase agreement, James sold Wolfe 84 shares of petitioner at a price of $750,000, plus interest at 7 percent per annum, payable in 120 equal monthly installments commencing on April 1, 1976. The agreement provided that the purchase price would be evidenced by a negotiable promissory note from Wolfe, and that the stock would be held in escrow until the full purchase price was paid. The stock purchase agreement specifically limited Wolfe's salary as president to $50,000 per year, and Wolfe's, Goldman's and Easley's aggregate salaries to $125,000 per year "plus any increases due to the *537 increases in the California cost of living index, and additional salaries for payment to Seller [James] in connection with the obligation owed hereunder." The escrow agreement specified that, pending payment of the full purchase price, all dividends declared on the shares held in escrow were to be applied to the payment of the next installment of principal and interest. Consistent with the terms of the stock purchase agreement, petitioner then redeemed James' remaining 16 shares. James lent petitioner the money with which to purchase these 16 shares. With James as its president and sole shareholder, petitioner's gross sales for its taxable years ended January 31 were as follows: Year
Gross Sales
1974
$709,776
1975
1,580,007
1976
3,027,438
For these same taxable years, petitioner reported taxable income for Federal income tax purposes as follows: Year
Taxable Income
1974
$67,466
1975
6,723
1976
171,992
Petitioner paid no dividends for these taxable years. James, as president, received the following compensation for the fiscal years indicated: Year
Compensation
1974
$32,116
1975
134,070
1976
272,744
*538 James' compensation for fiscal 1975 and 1976 was set by a contingent compensation formula adopted by petitioner's board of directors on January 15, 1975. The formula fixed James' salary at a base of $20,000, plus 10 percent of all gross sales in excess of $500,000. Petitioner's income tax returns for the fiscal years ended January 31, 1975, and January 31, 1976, were audited by respondent on the issue of the reasonableness of the compensation paid to James. Immediately prior to the sale of petitioner, Wolfe's annual salary was $15,000. Goldman's salary was about $17,000, and Easley's salary was $27,000 to $28,000. Petitioner During Wolfe's Presidency
During the taxable year ended January 31, 1977, Goldman and Easley maintained the same job responsibilities and duties with petitioner as they had prior to the sale. Wolfe acted in a general supervisory capacity and continued to retain control over the production of artwork. Decisions affecting inventory purchases and personnel pay scales were made by Wolfe, Goldman and Easley. Goldman made management decisions affecting warehouse operations and, along with Wolfe, the hiring and firing of personnel. Wolfe became president *539 of petitioner at a time of change for the corporation. A number of important business developments had occurred prior to the sale. In May 1975, petitioner moved its offices from West Hollywood to Van Nuys, California. The move caused significant employee turnover. Petitioner's increased sales volume and the larger size of the Van Nuys offices had required hiring of additional personnel. After James' conviction on Federal obscenity charges, James curtailed petitioner's mailing activity. He made minimal use of in-house lists and immediately stopped using rental lists.At a time when competition in the marketplace was intensifying, James ordered an end to the testing of names on the lists. Wolfe developed and improved petitioner's business practices. He increased the number and variety of petitioner's mailing pieces and produced all-color catalogs, which may have been an innovation in the industry. He reinstituted the cycle of testing and implemented the use of a computer system devised by James to better target mailings for specific items in petitioner's product line. Wolfe designed a book of photographs by Raffaelli, which became a successful item for petitioner. He completed *540 work on a series of films commissioned by James but never released. He oversaw a reduction in the size of petitioner's work force to what he believed was a more efficient level. In an effort to avoid the legal problems James encountered, Wolfe interviewed and retained a new First Amendment counsel. During the period in question, no obscenity charges were brought against petitioner or Wolfe. Subsequent to the sale of petitioner, Wolfe appointed himself and two friends as petitioner's board of directors. One of Wolfe's friends had experience in the sale and distribution of stuffed animal toys, while the other had no prior business experience. On the morning of March 1, 1976, petitioner's board of directors adopted a contingent compensation plan for Wolfe identical to the one in effect for James during petitioner's 1975 and 1976 fiscal years (i.e., a base salary of $20,000 plus 10 percent of gross sales in excess of $500,000). Wolfe under the contingent compensation agreement received a total salary for the taxable year ended January 31, 1977, of $269,635. No portion of this salary was payment for services past rendered. In comparison, Goldman and Easley, who were not compensated *541 on a contingent basis, received the following salaries: Goldman, $30,000-$35,000; Easley, $45,000. On January 21, 1977, petitioner established an employee stock ownership plan (ESOP) for its employees. Under the ESOP, petitioner contributed $26,825 to Wolfe's account for the fiscal year ended January 31, 1977. Wolfe's combined compensation for the taxable year ended January 31, 1977, thus totaled $296,450. During calendar year 1976, Wolfe made payments to James pursuant to the stock purchase agreement in the approximate amount of $108,000. During the fiscal year ended January 31, 1977, Wolfe's payments to James on the promissory note averaged between $6,000 and $7,000 per month. For its taxable year ended January 31, 1977, petitioner reported gross sales of $3,256,196, and taxable income of $182,969. Approximately 5.9 percent of petitioner's gross sales were made to wholesale buyers, and 94.1 percent to retail buyers. During the 1977 fiscal year, petitioner paid dividends of $15,120, which Wolfe received and applied towards payment of his note to James. On its Federal income tax return for the taxable year ended January 31, 1977, petitioner claimed a deduction of $269,635 *542 for compensation to Wolfe.As reflected on its income tax return, petitioner's equity was $82,089, and its net profits were $109,102. Respondent by statutory notice disallowed $122,564 of petitioner's claimed deduction for Wolfe's salary. The notice stated that petitioner had not established that any amount above $147,071 represented reasonable compensation for personal services rendered. Respondent did not disallow any portion of petitioner's $26,825 contribution to Wolfe's ESOP account. OPINION Section 162(a)(1)[2] allows a deduction for ordinary and necessary business expenses including "a reasonable allowance for salaries or other compensation for personal services actually rendered." There is a two-prong test for deductibility under section 162(a)(1): (1) The amount of the compensation must be reasonable and (2) the payments must in fact be purely for services. Elliotts, Inc. v. Commissioner,716 F.2d 1241, 1243 (9th Cir. 1983), revg. and remanding a Memorandum Opinion of this Court. The inquiry into reasonableness is a broad one and generally subsumes the inquiry into compensatory intent. *543 Elliotts, Inc. v. Commissioner,supra at 1245. Whether compensation is reasonable is a question to be resolved on the basis of an examination of all the facts and circumstances of a case. Charles Schneider & Co. v. Commissioner,500 F.2d 148, 151 (8th Cir. 1974), affg. a Memorandum Opinion of this Court, cert. denied 420 U.S. 908 (1975); Pacific Grains, Inc. v. Commissioner,399 F.2d 603, 605 (9th Cir. 1968), affg. a Memorandum Opinion of this Court. The determination of the Commissioner is presumptively correct, and the burden of proving the reasonableness of compensation is upon the petitioners. Botany Worsted Mills v. United States,278 U.S. 282 (1929). Many factors are relevant in determining whether compensation is reasonable, [3] and no single factor is decisive; the totality of facts and circumstances must be weighed. *544 Mayson Mfg. Co. v. Commissioner,178 F.2d 115, 119 (6th Cir. 1949), revg. a Memorandum Opinion of this Court. In Elliotts, Inc. v. Commissioner,supra,the Ninth Circuit, to which this case would be appealable, divided these factors into five broad categories.
*545 Role in Company
The first category of factors identified by the Ninth Circuit concerns the employee's role in the company. We shall consider Wolfe's qualifications, the nature of his duties as president and his performance of these duties. A. Wolfe's Qualifications
An employee's superior qualifications may justify a high level of compensation. See, e.g., Home Interiors & Gifts, Inc. v. Commissioner,73 T.C. 1142, 1158 (1980); Capitol Market, Ltd. v. United States,207 F. Supp. 376, 378-379 (D. Hawaii 1962). Respondent contends that neither Wolfe's academic record nor his prior experience justified his salary, while petitioner maintains that Wolfe possessed a combination of skills from education and on-the-job training that eminently suited him for the position of president of petitioner. We agree with petitioner that Wolfe was well-qualified to become president of the company. Wolfe's academic training, although not extensive, focused on the field of art, and artwork was vital to petitioner's success. There is no specialized educational preparation for becoming the chief executive officer of a company that sells erotic items. *546 Familiarity with the personnel of the company, and knowledge of the workings of the business may be of primary importance in directing such an enterprise. Wolfe's innovations in marketing techniques during his presidency are evidence of both generalized and specialized skills and ability. Wolfe began at the bottom of petitioner's corporate ladder but worked his way up to key employee status prior to the sale. He was with petitioner during its growth and legal difficulties. Among petitioner's key employees, with whom he had worked for a number of years, Wolfe was the only one willing to face the risks associated with becoming petitioner's president. Thus, by training, experience and inclination, Wolfe had the ability that was necessary to direct this unconventional enterprise. B. Nature of Wolfe's Duties
The extent of an employee's responsibilities and involvement in various aspects of the business is a factor in evaluating the worth of an employee. See, e.g., Elliotts, Inc. v. Commissioner,supra at 1245-1246; Roux Laboratories, Inc. v. United States, an unreported case ( *547 M.D. Fla. 1976, 38 AFTR 2d 76-6051, 76-2 USTC par. 9751). In moving from petitioner's art director to petitioner's chief executive officer, Wolfe's duties increased along with his salary. Like James, Wolfe was responsible for petitioner's success or failure.The record reflects that Wolfe was not a figurehead president. While remaining active in the art department (respondent concedes that under Wolfe petitioner "created brochures and catalogues in greater quantity and with more quality than prior to the sale"), Wolfe assumed new responsibilities in areas such as product selection and marketing, and exerted general day-to-day supervisory control over petitioner. C. Wolfe's Performance as President
An employee's compensation may reflect his contributions to the business. See, e.g., Dave Fischbein Manufacturing Co. v. Commissioner,59 T.C. 338, 352-353 (1972); Albert Van Luit Co. v. Commissioner,T.C. Memo. 1975-56. Respondent argues that James was responsible for the success petitioner enjoyed during the fiscal year ended January 31, 1977, and that Wolfe did little more than continue James' successful policies. *548 Petitioner maintains that Wolfe's efforts were of great value to the corporation, and we agree. Respondent's opening brief states, "James neglected his duties as CEO [chief executive officer] for the last half of the fiscal year [ended January 31, 1976] because of his legal problems in Louisiana." Wolfe reestablished an involved and more progressive management style at petitioner. He implemented programs begun by James but never completed and, without James' influence, made important changes, such as selecting new counsel and expanding and upgrading the variety of petitioner's mailings. Respondent maintains that during Wolfe's presidency petitioner's emphasis shifted from less to more sexually explicit products, and that petitioner's risk of prosecution correspondingly increased. The fact remains, however, that no prosecutions were initiated against petitioner or its president on account of activities conducted during Wolfe's presidency. In this respect, Wolfe succeeded where James had failed. [4]
*549 Wolfe acted to insure petitioner's continuing viability and profitability. We cannot fault him for not making drastic changes in areas where no such changes were needed. Although petitioner experienced only a small rate of growth in fiscal 1977 relative to earlier years, both its gross sales and its taxable income reached then record levels. We believe that Wolfe deserves considerable credit for this success. External Comparison
The second category of factors involves a comparison of the employee's salary with those paid by similar companies for similar services. Industry standards are important in determining whether compensation is reasonable. See, e.g., Pepsi-Cola Bottling Co. of Salina, Inc. v. Commissioner,61 T.C. 564 (1974), affd. 528 F.2d 176 (10th Cir. 1975); Trucks, Inc. v. United States,588 F. Supp. 638 (D. Neb. 1984), affd. 763 F.2d 339 (8th Cir. 1985). As section 1.162-7(b)(3), Income Tax Regs., provides, "It is, in general, just to assume that reasonable and true compensation is only such amount as would ordinarily be paid for like services by like enterprises under like circumstances." Both *550 parties presented expert testimony as to what level of salary was reasonable for an executive in a position comparable to Wolfe's. Petitioner called as its expert Robert Howard, the executive vice president of Houlihan, Lokey, Howard & Zuskin, Inc., a valuation consulting firm. In his written report to the Court, Howard concluded that Wolfe's salary for the fiscal year 1977 was reasonable based on (1) the risks to reputation and person involved, (2) the complexity of Wolfe's duties and the number of hours he worked each week, [5] and (3) the fact that Wolfe was compensated under the same contingent compensation formula used for James.Howard considered petitioner to be "highly unique," and one of only a small number of companies for which a comparable company could not be found. He stated that his testimony and report were based not on empirical data but on his experience and knowledge of petitioner. He related that in early 1977 his firm was engaged to value petitioner's stock and that it has been subsequently engaged annually to value that stock. *551 Respondent called as its expert witness Emmet James Brennan, III. As president of Brennan, Thomsen Associates, Inc., Brennan conducts pay studies and surveys. In the summary findings of a written report submitted to the Court, Brennan compared the pay levels of chief executive officers of firms with sales revenues of $3.256 million (petitioner's gross sales) in all industries, the retail industry, the wholesale industry, the nondurable goods manufacturing industry, the publishing industry and the motion picture industry. [6] The following table summarizes his findings: Industry Classification
Competitive Total Pay
Maximum Reasonable
Total Pay
All Industries
$73,935
$92,419
Retail
52,791
65,989
Wholesale
70,210
87,762
Nondurable
61,066
76,332
Publishing
88,771
110,964
[7] Motion Pictures *    *   Brennan's summary findings [8] were supplemented by survey data on each of these industries. *552 Brennan prepared his summary findings under the assumption that petitioner paid bonuses to its employees. He subsequently concluded, however, that petitioner was not a bonus-paying company. Brennan stated that non-bonus-paying companies tend to pay less than bonus-paying companies and, therefore, his summary figures were excessively high. He further testified that his report was based on the hypothesis that Wolfe was an irreplaceable chief executive and that since preparing the report he had concluded that Wolfe was not. Brennan concluded that Wolfe was overcompensated. We regard the expert evidence of both parties as flawed. Based on his testimony and credentials, Howard, petitioner's expert, seemed less qualified in the specific area of executive compensation than his counterpart, Brennan. In reaching his conclusions regarding the reasonableness of Wolfe's compensation, Howard relied less on factual data, which we can independently evaluate, than on his experience and judgment, which we cannot. We find his method to be suspect [9] and consequently accord his opinion relatively little weight. Brennan, on the other hand, presented us with considerable factual data to support *553 his conclusions. His report was well-documented, and his method seemed thorough. Brennan, however, offered no data on businesses that sell sexually oriented publications, movies and devices. We are not satisfied that a reasonable level of compensation for an executive like Wolfe can be accurately determined by reference to the industries Brennan surveyed because of the absence of significant information on other businesses similar to petitioner's. [10]Comparing the compensation paid officers of companies that differ markedly provides guidance of dubious quality. See Giles Industries, Inc. v. United States,227 Ct.Cl. 496, 504, 650 F.2d 274, 278 (1981); Niagara Falls Coach Lines, Inc. v. Commissioner,T.C. Memo. 1977-269. Accordingly, we are unable to attach much weight to Brennan's opinion. *554 Character and Condition of Company
The third general category of factors identified by the Ninth Circuitconcerns the character and condition of the company. The Court stated that the focus under this category may be on the company's size, as indicated by its sales, net income or capital value, and the complexities of the business and general economic conditions. Elliotts, Inc. v. Commissioner,supra at 1246. Petitioner's gross sales during the taxable year ended January 31, 1977, were $3,256,196. As measured by this figure, petitioner was a relatively small-sized business. As we have indicated, however, petitioner occupied a rather unusual niche in the business world. Because of its product line, petitioner faced challenges significantly different from those encountered by most businesses, and it did so in a highly competitive marketplace. While neither party presented evidence with which we can definitively compare petitioner's operations with those of similar businesses, the evidence suggests that petitioner was one of the larger and more successful companies of its kind. Conflict of Interest
The fourth category of factors described by *555 the Ninth Circuit includes those that may indicate a conflict of interest. The primary issue within this category is whether some relationship exists between the taxpaying company and its employee which might permit the company to disguise nondeductible corporate distributions of income as salary expenditures deductible under section 162(a)(1). Such a potentially exploitable relationship may exist where * * * the employee is the taxpaying company's sole or controlling shareholder. * * * [Fn. ref. and citations omitted.] Elliotts, Inc. v. Commissioner,supra at 1246. Under the category of "conflict of interest" we will address two factors discussed by the Ninth Circuit in Elliotts, Inc. v. Commissioner,supra, the existence of free bargaining in determining compensation and the perspective of a hypothetical independent investor in evaluating the compensation payments. A. Existence of a Free Bargain in Determining Compensation
For the taxable year at issue, Wolfe was paid under a contingent compensation formula. Section 1.162-7(b)(2), Income Tax Regs., provides as follows with respect to contingent compensation plans: The *556 form or method of fixing compensation is not decisive as to deductibility. While any form of contingent compensation invites scrutiny as a possible distribution of earnings of the enterprise, it does not follow that payments on a contingent basis are to be treated fundamentally on any basis different from that applying to compensation at a flat rate. Generally speaking, if contingent compensation is paid pursuant to a free bargain between the employer and the individual made before the services are rendered, not influenced by any consideration on the part of the employer other than that of securing on fair and advantageous terms the services of the individual, it should be allowed as a deduction even though in the actual working out of the contract it may prove to be greater than the amount which would ordinarily be paid. Petitioner argues that Wolfe's compensation was set by an arm's-length bargain. Respondent, on the other hand, maintains that the contingent compensation agreement was not entered into under an atmosphere of free bargaining.We agree with respondent. The question of whether a compensation agreement results from a "free bargain" is one of fact. All circumstances *557 bearing upon the ability of the employer to exercise a free and independent judgment are relevant to that question. Harolds Club v. Commissioner,340 F.2d 861, 865 (9th Cir. 1965), affg. a Memorandum Opinion of this Court. On the evening of February 28, 1976, Wolfe and James contracted that Wolfe's salary as petitioner's president would not exceed $50,000 "plus any increases due to the increases in the California cost of living index, and additional salaries for payment to Seller in connection with the obligation owed hereunder." (Emphasis added.) Petitioner's board of directors met the next morning. The board, composed of Wolfe and two personal friends without related business experience or demonstrated independence, set Wolfe's compensation according to the same formula used for James. The compensation formula, of course, allowed Wolfe to earn more than $50,000 per year and gave Wolfe the means to make the payments on his obligation to James. Other than his compensation from the corporation, Wolfe had no obvious means to make the $6,000 to $7,000 monthly payments due James. [11] Given petitioner's failure to establish the independence of the directors who *558 determined Wolfe's salary and Wolfe's obvious need for funds and lack of an alternative source for his payments to James, we cannot say that Wolfe's contingent compensation was "not influenced by any consideration on the part of the employer other than that of securing on fair and advantageous terms the services of the individual." B. Hypothetical Independent Investor's Evaluation
The Ninth Circuit stated that in evaluating the reasonableness of compensation paid to a shareholder-employee, it is helpful to consider the matter from a hypothetical independent shareholder's perspective: [12]
If the bulk of the corporation's earnings are being paid out in the form of compensation, so that the corporate profits, after payment of the compensation, do not represent a reasonable return on the shareholder's equity in the corporation, then an independent shareholder would probably not approve of the compensation arrangement. If, however, that is not the case and the company's earnings on equity remain *559 at a level that would satisfy an independent investor, there is a strong indication that management is providing compensable services and that profits are not being siphoned out of the company disguised as salary. [Fn. ref. omitted.] Elliotts, Inc. v. Commissioner,supra at 1247. As reflected on its Federal income tax return for the taxable year ended January 31, 1977, petitioner's equity was $82,089 and its net profits (profits less taxes and compensation paid Wolfe) was $109,102. [13] This amounts to a rate of return on equity of almost 133 percent. This rate of return on equity obviously would please an independent investor, and suggests that petitioner and Wolfe may not have been exploiting their relationship. An independent investor, however, *560 might very well chafe at the effect of the provision in the escrow agreement requiring all dividends to be applied to the payment of Wolfe's obligation to James. Petitioner during the taxable year ended January 31, 1977, paid dividends for the first time in its corporate history, but the full amount of the dividend was applied towards payment of Wolfe's note. Internal Consistency
The fifth and final set of factors identified by the Ninth Circuit is internal inconsistency in a company's treatment of payments to employees. Evidence of such inconsistency may indicate that payments go beyond reasonable compensation. Elliotts, Inc. v. Commissioner,supra at 1247. In determining whether the salary paid a particular employee is reasonable, the salaries paid other employees of the business are relevant. *561 Home Interiors & Gifts, Inc. v. Commissioner,supra at 1159; Kipnis v. Commissioner,T.C. Memo. 1982-471; Ken Miller Supply, Inc. v. Commissioner,T.C. Memo. 1978-228. The existence of a longstanding, consistently applied compensation plan is evidence that questioned salary payments are reasonable. Elliotts, Inc. v. Commissioner,supra at 1247. During the taxable year ended January 31, 1977, Wolfe received $269,635 in salary, [14] while Goldman received between $30,000 and $35,000, and Easley received $45,000.Respondent argues that the disparity among these three salaries is persuasive of the unreasonableness of Wolfe's salary. Respondent notes that his expert, Brennan, testified and presented survey data that the second-ranking executive in a corporation receives about 70 percent of the chief executive's compensation, and that the third-highest paid executive tends to receive compensation fairly close in amount to the second executive's pay. We decline to measure the comparative worth of Wolfe's services by reference to Brennan's formula. As we have indicated, we disagree with Brennan's opinion regarding *562 Wolfe's qualifications and performance as president. Nevertheless, we are influenced by the difference among Wolfe's, Easley's and Goldman's compensation. Although Wolfe, as president, had significantly greater responsibilities than Easley and Goldman, all three men were key and long-time employees of the corporation Each performed an important role in the Wolfe administration. Easley made management decisions affecting such areas as inventory purchases and personnel pay scales; Goldman was active in such areas as warehouse operations and the hiring and firing of personnel. We do not believe that petitioner's salary structure accurately reflects the relative managerial responsibility of these three men. Wolfe was compensated under a contingent compensation formula used during the taxable year ended January 31, 1977, for the first time to compensate Wolfe and for the third time to compensate petitioner's president. [15] Accordingly, it is difficult to regard the contingent compensation formula *563 as a compensation practice of longstanding duration. Compare Elliotts, Inc. v. Commissioner,supra at 1247-1248 (predetermined formula in use for over 20 years); Streckfus Steamers, Inc. v. Commissioner,19 T.C. 1 (1952) (modified in 1942, contingent compensation plan challenged for the years 1942-1946 first adopted in 1931); Albert Van Luit Co. v. Commissioner,supra (contingent compensation formula challenged for 1969 and 1970 adopted in 1946).
Conclusion
We have considered the factors relevant in deciding reasonable compensation for Wolfe. Based on all of the evidence, we hold that reasonable compensation for Wolfe for the taxable year ended January 31, 1977, was $200,000 in salary *564 plus $26,825 in contributions to his ESOP account. Accordingly, Decision will be entered under Rule 155.
Footnotes
1. Petitioner and James ran afoul of local authorities as well. In Dec. 1975, petitioner was served with a search warrant issued by a judge of the Municipal Court of Los Angeles Judicial District, County of Los Angeles, and the premises of petitioner were searched. Goldman was handcuffed during the raid, and petitioner's employees were searched. On Aug. 6, 1976, after James had left the company, a misdemeanor complaint was filed against petitioner and James, alleging violations occurring on or about Dec. 15, 1975.James pled guilty to two reduced counts of disturbing the peace and was fined $500 and placed on three years summary probation.↩
2. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable year at issue.↩
3. The parties focus particularly on a number of the factors enumerated in Foos v. Commissioner,T.C. Memo. 1981-61. In Foos v. Commissioner,supra, we referred to the following factors: 1.Employee's qualifications and training. 2. Nature, extent, and scope of his duties. 3. Responsibilities and hours involved. 4. Size and complexity of the business. 5. Results of the employee's efforts. 6. Prevailing rates for comparable employees in comparable business. * * * 7. Scarcity of other qualified employees. 8. Ratio of compensation to gross and net income (before salaries and Federal income tax) of the business. 9. Salary policy of the employer to its other employees. 10. Amount of compensation paid to the employee in prior years. 11. Employee's responsibility for employer's inception and/or success. 12. Time of year the compensation was determined. 13. Whether compensation was set by corporate directors. 14. Correlation between the stockholder-employees' compensation and his stockholding. 15. Corporate dividend history. 16. Contingent compensation formulas agreed on prior to the rendition of services and based upon a free bargain between the employer and employee. * * * 17. Under-compensation in prior years. 18. Compensation paid in accordance with a plan which has been consistently followed. 19. Prevailing economic conditions. 20. Whether payments were meant as an inducement to remain with the employer. 21. Examination of the financial condition of the company after payment of compensation. We will refer to many of these factors within the framework of our opinion.↩
4. We are not herein concerned with Wolfe's or petitioner's morality, but with the reasonableness of compensation paid.It is our duty in this case to construe the revenue statutes, and not to express any judgment concerning the morality or social utility of petitioner's activities. See Associated Industries of Cleveland v. Commissioner,7 T.C. 1449, 1466↩ (1946).
5. According to Howard's report, Wolfe consistently worked in excess of 40 hours per week. Howard testified that Wolfe worked from 60 to 70 hours per week. Howard was unable to identify precisely his source for this information.↩
6. The report indicates that Brennan had difficulty classifying petitioner for pay comparison purposes. Brennan chose these six categories as possible industry matches for petitioner. ↩
7. Because the data sources available for this category applied only to firms with sales in excess of $273,000,000, Brennan did not make a finding as to competitive and maximum reasonable pay. ↩
8. Although the competitive base pay figures determined by Brennan reflect lesser amounts than allowed by respondent in the notice of deficiency, respondent nevertheless states that he is willing to allow petitioner the amount set forth in the notice. Respondent does not explain how he arrived at the amount proposed in the notice ($147,071) as reasonable compensation for Wolfe, or attempt to reconcile this amount with Brennan's figures.↩
9. Howard's sources of information often seemed to be somewhat questionable. For example, in his report he stated that "military mercenaries demand substantial sums to fight due to the risk of physical harm and the social stigma attached to such endeavors." He likened sellers of sexually explicit material to military mercenaries with respect to risk taking. On cross-examination, respondent's counsel questioned him about the above quotation: Q. Where did you get your information on military mercenaries? A. Based on newspaper accounts, which I can agree may or may not be factual. Again, a general perception, a general knowledge. ↩
10. Moreover, we would not be bound by Brennan's findings even if we were to conclude that they established a norm for the compensation payable for Wolfe's services. Sec. 162(a)(1) was not designed to regulate businesses by denying them a deduction for the payment of compensation in excess of the norm. HomeInteriors & Gifts, Inc. v. Commissioner,73 T.C. 1142, 1162 (1980). The deduction is merely limited to a reasonable salary under the circumstances. Lefkowitz v. Commissioner,T.C. Memo. 1983-356↩.
11. Neither party explains how Wolfe made $108,000 in payments during calendar year 1976 when his monthly payments, which began Apr. 1, 1976, were between $6,000 and $7,000.↩
12. Our discussion of the hypothetical independent investor factor proceeds without the benefit of argument by petitioner and respondent. To our surprise, neither parties' brief contained this factor or cited Elliotts, Inc. v. Commissioner,716 F.2d 1241↩ (9th Cir. 1983), revg. and remanding a Memorandum Opinion of this Court, where the hypothetical investment factor is discussed at length.
13. To arrive at petitioner's equity, we added together the listed amounts for paid-in or capital surplus, capital stock, and unappropriated retained earnings. To arrive at its net profits, we subtracted petitioner's total tax from its taxable income.↩
14. As we have indicated, Wolfe additionally received a $26,825 contribution to his ESOP plan. Respondent, on brief, does not argue that this amount represents unreasonable compensation.↩
15. Petitioner argues that respondent's allowance of deductions to petitioner for the taxable years ended Jan. 31, 1975, and Jan. 31, 1976, for James' salary under the contingent compensation plan establishes that Wolfe's salary for the taxable year ended Jan. 31, 1977, was reasonable. This, of course, is incorrect. See Owensby & Kritikos, Inc. v. Commissioner,T.C. Memo. 1985-267↩ at n. 10, and cases cited therein.